

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

|  | § |  |
|---|---|---|
| WILLIAMS-PYRO, INC., | | No. 08-11-00355-CV |
| | § | |
| Appellant and Cross-Appellee, | | Appeal from |
| | § | |
| v. | | 153rd District Court |
| | § | |
| RHONDA BARBOUR, | | of Tarrant County, Texas |
| | § | |
| Appellee and Cross-Appellant. | | (TC # 153-223671-07) |
| | § | |

**O P I N I O N**

Rhonda Barbour sued her former employer Williams-Pyro, Inc. (WPI) for age discrimination under the Texas Commission on Human Rights Act. A jury found in favor of Barbour and awarded her $40,000 in damages for back pay, $10,000 in lost employment benefits, $100,000 in past compensatory damages, and $100,000 in future compensatory damages. The trial court determined that the statutory caps required under Texas Labor Code Section 21.2585(d)(1) should be applied to the jury's award of damages and rendered judgment for Barbour in the amount of $120,714, exclusive of attorney's fees and costs. Based on a prior agreement between the parties, the trial court then addressed Barbour's claim for attorney's fees. In her claim for attorney's fees, Barbour asked the court to apply a multiplier to enhance her fee award. After the hearing, the trial court determined that Barbour was entitled to attorney's fees in the amount of $154,335, but concluded that it did not possess the authority under Section

21.259 of the Texas Labor Code to apply a multiplier. The court specifically ruled that if did have such authority, a 1.5 multiplier was appropriate.

WPI then filed the instant appeal. It challenges the trial court's judgment, complaining that: (1) the evidence is legally and factually insufficient to support the jury's verdict that age was a motivating factor in WPI's decision to terminate Barbour, and (2) that the trial court lacked subject-matter jurisdiction over Barbour's discrimination case because she failed to fully exhaust her administrative remedies before filing suit. Barbour also appeals, contending that the trial court erred by not applying a multiplier to her attorney's fee award. For the reasons that follow, we affirm the judgment in its entirety.

## FACTUAL SUMMARY

WPI develops and manufactures products for various industries involved in oil and gas development, fire suppression, aeronautics, and national defense. In 1988, Bob Williams hired twenty-six year old Rhonda Barbour to work at WPI. Mr. Williams was the co-founder of WPI and, at the time he hired Barbour, he was also WPI's president and CEO. When Mr. Williams hired Barbour he was looking to expand WPI's business to include a new line of fire extinguishers or fire suppression devices. He personally trained Barbour to assemble the products on the new fire extinguisher/suppression line. More specifically, Mr. Williams taught Barbour to assemble the "charge caps" for WPI's fire-suppression product known as the "StoveTop FireStop." The assembly of the charge caps involved the use of a dangerous and explosive chemical called lead styphnate. The government considers lead styphnate to be an explosive and therefore heavily regulates its use. Accordingly, because of the dangers involved, the charge caps were assembled in a specific room, separated from the rest of WPI's business. Dealing with these explosives also required Barbour to possess a special set of skills.

About a year after Barbour was hired, WPI established a specific assembly line for the sole purpose of manufacturing the fire suppression devices. The line was referred to as the "pyro line." Barbour was the supervisor of the pyro-line and she was responsible for training the new employees.[1]

In 1996, Mr. Williams passed away and his wife, Della Williams, took over as President and CEO of WPI.[2] According to Mrs. Williams, handling the lead styphnate was the most dangerous aspect of WPI's operation. She also acknowledged that the very existence of the pyro line depended upon Barbour building the charge caps.

Barbour continued her work assembling charge caps for the fire suppression devices for her first seventeen years as a WPI employee. James Craig Walters supervised Barbour from 1998 to 2004. He testified that Barbour:

> [C]could use some improvement because she is quick to talk about people behind their back and stir up criticism pools with other employees. I addressed this problem with her and she said it was from being frustrated but in the end she agreed to stop.

According to Walters, on Barbour's 2003 work performance review he specifically noted that there were improvements he wanted to see. Barbour was good at "repetitive tasks," but that she was not good at tasks that involved change. Although Walters did not recall ever giving Barbour a written warning, he testified that he spoke with her on several occasions regarding her behavior. He considered these discussions oral reprimands or warnings.

In 2005, the company completed development on a safer alternative to the charge caps, which did not involve the use of explosives. This new design no longer required Barbour's

---

[1] Sally Espinoza was also a supervisor on the pyro line. Espinosa testified that Barbour was a good employee and a hard worker. She also testified that Barbour was easy to get along with and that she never observed any combative behavior by Barbour.

[2] At the time Mrs. Williams took over control and ownership of the company WPI had nine employees. By the time of trial (May 2011), WPI employed ninety-nine employees.

specialized skills, nor did it require the assembly to occur in an isolated environment. According to Mrs. Williams, as the new design was implemented, the old method of using lead styphnate was phased out. Likewise, Barbour's position was effectively phased out.

Barbour was then re-assigned to the "connectivity and test systems" (CaTS) assembly line.[3] The CaTS assembly area included both mechanical and electrical assembly. Although Barbour had previously spent the majority of her time working on the pyro assembly line, she had worked on both the electrical and mechanical assembly lines from time to time as needed.

Employees in the CaTS assembly area each had work orders, or written instructions, at their work stations describing the device(s) being assembled. Once a work order was complete, it was reviewed by the WPI Quality Assurance Department. The Quality Assurance Department would check each work order and return any orders containing errors.

Tammy Renteria, a CaTS assembly leader, testified that an assembly leader also had a duty to go from station to station along the CaTS assembly line, double-check each assembler's work, and see whether the assemblers had any questions or otherwise needed work orders or parts for assembly.

When Barbour began working on the CaTS assembly line, her supervisor was Stacy Chapa. Chapa supervised Barbour from June 2005 to December 2005, during which Barbour received two positive performance evaluations. The first performance evaluation was signed by Paul Shiller, WPI's Operations Manager, and gave Barbour a "good" rating. The second performance evaluation, signed by Vice President Brent Williams, included the following comments regarding Barbour's performance: (1) "tracks and completes assigned work independently after initial instructions and feedback;" (2) "positive and supportive of the

---

[3] At the time she was re-assigned in 2005, Barbour was 42 years old.

company's mission;" (3) "knows the status of tasks the standards for accuracy and quantity;" (4) "exhibits patience with customers/co-workers;" (5) "maintains courteous and cooperative relationships with supervisor and co-workers;" and (6) "accepts supervision, change and feedback." Based on this evaluation, Barbour received a pay raise. Chapa testified that as of December 2005, she had worked with Barbour for seventeen years and never had any problems with her.

Jose "Joe" Montalvo began working at WPI in 2004 as a Quality Inspector. He was later promoted to supervisor of the Quality Inspection area (or Quality Assurance Department). At the time Barbour was reassigned to the CaTS assembly line in 2005, Montalvo was the supervisor in charge of the quality inspection area. In April or May 2006, Montalvo became the production manager for the CaTS assembly area.[4] As production manager, Montalvo also became Barbour's direct supervisor.

According to Barbour, in 2005 Montalvo began making age-related comments to her. He made comments about her gray hair and told her that she was getting old and looking old. He also suggested that she color her hair, stating that if she were his wife, she would not look like she did. On occasions when she was in the inventory room and would have to bend over, Montalvo would tell her that her butt was getting big and that she was looking old. Montalvo eventually mentioned replacing Barbour with "young Mexican girls." Barbour said these comments were made three or four times a week. She also testified that Montalvo's tone was serious and that his comments made her scared and sick.

Once Montalvo became her direct supervisor on the CaTS assembly line, he continued to make comments about her age. At that point, Barbour decided to report the comments to Paul

---

[4] This was the first time Montalvo had been Barbour's supervisor.

Shiller, the Operations Manager. According to Barbour, in May or June 2006, she reported Montalvo's behavior to Shiller. She told Shiller, in detail, about all of Montalvo's age-related comments. Montalvo admitted making some comments related to the color of Barbour's hair but said he was only joking.

Shiller acknowledged that Barbour came to him regarding Montalvo's comments but she mentioned them casually and never described them with any specificity. Shiller questioned Montalvo about the comments, but that conversation was the end of the matter. Shiller acknowledged that under WPI's policy, a complaint of discrimination should have been reported to Human Resources for investigation. But admittedly, he never reported the comments to Human Resources and the claim was not investigated. Sally Espinosa, a former supervisor at WPI, testified that she heard Montalvo tell Barbour that she was getting too old and fat and that WPI needed to hire younger girls. Martha Thomas, a CaTS assembly line worker, also testified regarding Montalvo's behavior. According to Thomas, things changed when Montalvo became supervisor of the CaTS assembly line. She believed Montalvo was trying to get her to resign, which she did in 2008.

Mr. Walters, Barbour's supervisor from 1998 to 2004, testified that he observed Barbour interacting with Montalvo but he never heard Montalvo make derogatory comments toward Barbour.

Mrs. Williams, owner of WPI, testified that she was never informed about Barbour's complaints regarding Montalvo. She found the comments offensive and they should have been reported to the Human Resources Department. According to her, even jokes about age should be reported to Human Resources. On November 15, 2006, WPI terminated Barbour's employment. The only people in the room were Montalvo, Shiller, and Candace Woodard from Human

Resources. Montalvo did all the talking. Barbour was not given a reason for her termination. Barbour asked to speak to Mrs. Williams or her son, Brent Williams, but was told by Montalvo that they "had already been informed." Montalvo admitted that he never gave Barbour a written reprimand prior to terminating her. He also admitted that he generally gives an employee an oral warning and a written reprimand before terminating that employee, and that he had given other employees written warnings if they had done something "really wrong." According to Montalvo, he had orally reprimanded Barbour at some point, but Barbour testified that she never received a verbal warning while for WPI. No written reprimands appear in Barbour's file.

## PROCEDURAL HISTORY

On December 13, 2006, Barbour filed an administrative complaint with the Texas Workforce Commission (TWC) alleging age discrimination as the reason for her termination. TWC forwarded Barbour's complaint to WPI on December 22, 2006. After investigating Barbour's discrimination claims, the TWC issued a Dismissal and Notice of Right to File a Civil Action.

After her termination, Barbour also applied for unemployment benefits with the TWC. In January 2007, a telephone hearing was conducted. Montalvo and Human Resources representative Candace Woodard participated in the telephone hearing on behalf of WPI. Montalvo stated that Barbour was terminated because of errors on a contact socket order and a knob order and her scheduling of time on the knob order. This was the first time Barbour had heard a reason for her termination. According to Barbour, she was never made aware of any errors with the contact sockets order prior to her termination, or at any time prior to the TWC hearing. Barbour also testified that she did not make the errors on either the contact socket order or the chalk knobs work order.

Valerie Dorsette was Barbour's co-worker in the CaTS assembly area. Barbour testified that Dorsette was the assembler on the knob work order and Barbour was only a helper. The "assembler" on the work order is responsible for confirming that the correct parts have been provided and for completing the work order. According to Barbour, she had asked Dorsette whether she confirmed that the knob order was correct, and Dorsette stated that she had.

On April 23, 2007, Barbour filed the instant suit alleging age discrimination. The case was tried to a jury. The charge instructed the jury to answer three questions. Question 1 asked:

> Was age a motivating factor in Williams-Pyro, Inc.'s decision to discharge Rhonda Barbour?
>
> A 'motivating factor' in an employment decision is a reason for making the decision at the time it was made. There may be more than one motivating factor for an employment decision.
>
> Answer 'Yes' or 'No'

The jury answered "yes." Because the jury answered yes to Question 1, the jury was then instructed to answer Question 2:

> Would Williams-Pyro, Inc. have taken the same action inquired about in Question 1 when it did, in the absence of the impermissible motivating factor, if any?
>
> Answer 'Yes' or 'No'

The jury answered "No." Finally, the jury was asked to award damages based on their liability determination. In response to Question 3, the jury awarded Barbour $40,000 in damages for back pay, $10,000 in lost employment benefits, $100,000 in past compensatory damages, and $100,000 in future compensatory damages. After the jury rendered its verdict, WPI filed a post-trial plea to the jurisdiction and a motion to dismiss. Barbour also filed a post-trial motion for attorney's fees. On July 19, 2011, the trial court held a hearing. The next day, it signed an order

denying WPI's plea to the jurisdiction. That same day it also signed its final judgment. The judgment stated in relevant part:

> [A] jury, having been empaneled and sworn to try this cause, and after hearing the pleadings, evidence, and argument of counsel, and after the trial court read the Charge of the Court to the jury, the jury did return into open court its verdict, duly signed by ten jurors, and in response to special issues, definitions and explanatory instructions submitted to them by the Court in its Charge, which findings as verdict of the jury were received by the Court and entered into the record and minutes of the docket of said Court, and the Court heard arguments and evidence regarding attorneys fees. The Court does hereby enter its Judgment as follows:
>
> 1. Plaintiff Barbour is hereby entitled to recover damages from the Defendant Williams-Pyro, Inc., in the sum of One Hundred and Twenty Thousand and Seven Hundred Fourteen Dollars and Forty Cents ($120,714.40), which includes. pre-judgment interest that accrued on the award of past compensatory damages of Fifty Thousand Dollars ($50,000.00), and past lost wages awarded by the Court in the amount of Forty Thousand Dollars, ($40,000.00) and past employment benefits in the amount of Ten Thousand Dollars ($10,000.00) at the rate of Five percent (5%) per annum, simple interest. Such interest accrued from April 23, 2007, the date on which suit was filed in this cause through June 13, 2011.
>
> 2. The Court finds that counsel for the Plaintiff, Jason C.N. Smith and Zoe Courtney, have reputations for providing highly competent, ethical, and qualified legal representation of individuals in employment matters such as this case and that Plaintiff is entitled to recover her reasonable and necessary attorney fees. The Court awards reasonable and necessary attorney's fees and orders Defendant to pay Plaintiff the amount of One Hundred Fifty-Four Thousand Three Hundred Thirty-Five Dollars ($154,335.00) in attorneys fees through trial, Thirty Thousand Dollars ($30,000.00) for any appeal to the Court of Appeals in which she prevails, Twelve Thousand Dollars ($12,000.00) for any Petition filed with the Texas Supreme Court in which she prevails and Thirty Thousand Dollars ($30,000.00) if the Texas Supreme Court requests full briefing in which she prevails.

On August 29, 2011, the trial court filed two separate sets of findings of fact and conclusions of law. One related to its decision denying WPI's plea to the jurisdiction and motion to dismiss and the other related to Barbour's motion for attorney's fees. WPI then filed a Motion for Judgment Notwithstanding the Verdict and Alternative Motion for New Trial. On September 26, 2011, the trial court held a hearing to address both motions and on October 19, 2011, the trial court issued an order denying them in their entirety.

**WPI's APPEAL**

WPI challenges both the factual and legal sufficiency of the evidence to support the jury's finding that Barbour's age was a motivating factor in WPI's decision to terminate her employment. It also contends that the court lacks subject matter jurisdiction to hear this case because Barbour failed to exhaust her administrative remedies before filing suit in district court. We will begin by addressing WPI's jurisdictional argument.

### *Subject Matter Jurisdiction*

In Issue Three, WPI argues that Barbour failed to properly exhaust her administrative remedies before filing the instant suit, thereby depriving the trial court and by extension this court of subject matter jurisdiction. Under Texas law, the exhaustion of administrative remedies is a mandatory prerequisite to filing an action under TCHRA, and the failure to exhaust TCHRA's administrative remedies deprives the court of subject matter jurisdiction. *See Hoffmann–La Roche, Inc., v. Zeltwanger*, 144 S.W.3d 438, 446 (Tex. 2004); *City of Waco v. Lopez*, 259 S.W.3d 147, 149, 154 (Tex. 2008). Under TCHRA, the exhaustion of administrative remedies begins when a party files a charge of discrimination with the Texas Workforce Commission. *See* TEX.LAB.CODE ANN. § 21.201 (West 2006); *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 804 (Tex. 2010).

Courts construe complaints filed under TCHRA liberally and "look slightly beyond [the] four corners, to [the] substance rather than [the] label." *Pacheco v. Mineta*, 448 F.3d 783, 789 (5th Cir. 2006). That said, the charge must contain a sufficient factual basis to put the employer on notice of the existence and nature of the charges. *Bartosh*, 259 S.W.3d at 321, *citing Preston v. Texas Department of Family & Protective Services*, 222 F. Appx 353, 356 (5th Cir. 2007)(per curiam). "The crucial element of a charge of discrimination is the factual statement contained in

the administrative complaint." *Bartosh v. Sam Houston State University*, 259 S.W.3d 317, 321 (Tex.App.--Texarkana 2008, pet. denied), *quoting Preston*, 222 Fed. Appx. at 356 (internal quotations omitted). The scope of a suit under TCHRA is limited to the scope of the investigation that "can reasonably be expected to grow out of the charge of discrimination." *Pacheco*, 448 F.3d at 789, *quoting Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 463 (5th Cir. 1970)(internal quotations omitted); *Bartosh*, 259 S.W.3d at 321. If, by looking to either the factual allegations or the checked boxes, a specific type of discrimination claim could reasonably be expected to grow out of the allegations in an EEOC charge, then the plaintiff has exhausted her administrative remedies. *See Briggs v. DART Regional Rail Right of Way Co.*, 2005 WL 3133505 (Nov. 23, 2005 N.D.Tex.). Therefore, Barbour's claims in the instant suit may only include those claims stated in her administrative complaint, and factually related claims that could reasonably be expected to fall within the agency's investigation of the claims stated in the charge. *Fine v. GAF Chem. Corp.*, 995 F.2d 576, 578 (5th Cir.1993); *University of Texas v. Poindexter*, 306 S.W.3d 798, 810 (Tex.App.--Austin 2009, no pet.); *Thomas v. Clayton Williams Energy, Inc.*, 2 S.W.3d 734, 738 (Tex.App.--Houston [14th Dist.] 1999, no pet.).

Barbour filed an EEOC claim in December 2006. On her sworn charge of discrimination, Barbour marked the box for "age" as the type of discrimination alleged. EEOC Form 5 requested the following information: (1) personal harm; (2) reason for adverse action; and (3) discrimination statement. Barbour completed the "personal harm" section with the following statement: "I was terminated from my job on 11/15/06." She also stated on the form that she was told by WPI that they did not need a reason to terminate her. Finally, as her "discrimination statement," Barbour stated that she "believed [she] was terminated because of her age, 44 years old, in violation of Texas Labor Code, Chapter 21."

- 11 -

After denying WPI's plea to the jurisdiction, the trial court issued findings of fact and conclusions of law which stated in relevant part:

21.  On February 26, 2007, Rhonda Barbour provided additional information to the Texas Workforce Commission regarding her years of service at Williams-Pyro, Inc. and her excellent work record.

22.  Plaintiff did not allege a hostile work environment claim based on age in her sworn charge of discrimination.

23.  Rhonda Barbour received a Notice of Right to File a Civil Action on February 27,2007.

On appeal, we must determine whether the allegations in Barbour's original charge and/or her subsequent amendment could reasonably give rise to an investigation of her claims of discrimination based on age.  *See Pacheco*, 448 F.3d at 789; *Poindexter*, 306 S.W.3d at 810; *Clayton Williams Energy*, 2 S.W.3d at 738.  As Barbour's attorney's pointed out during the plea to the jurisdiction hearing, a plaintiff does not have to put down every piece of information that she will eventually use at trial on the EEOC form to sufficiently exhaust administrative remedies under the statute.  Here, Barbour's EEOC claim alleged sufficient information to put WPI on notice of her age discrimination claim.  We conclude that Barbour exhausted her administrative remedies and overrule Issue Three.

### *Sufficiency of the Evidence*

In Issue One, WPI complains that the evidence is legally insufficient to prove that age was a motivating factor in WPI's decision to terminate Barbour because there is no evidence that:  (1) WPI treated Barbour less favorably than similarly situated WPI employees of the opposing class; and (2) WPI's proffered reasons for terminating Barbour were pretext for discrimination.  Appellant also contends that, "Montalvo's alleged workplace remarks are not evidence of pretext or that WPI terminated  Barbour because of her age."  Alternatively, in Issue

Two, WPI argues that evidence is factually insufficient to support the finding that Barbour's age was a motivating factor in WPI's decision to terminate Barbour's employment.

In conducting a legal sufficiency review, we view all evidence in a light most favorable to the prevailing party, indulging every reasonable inference in favor of the judgment. *Bradford v. Vento*, 48 S.W.3d 749, 754 (Tex. 2001). However, if the evidence allows for only one inference, neither the jurors nor a reviewing court may disregard it. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005); *Contreras v. Bennett*, 361 S.W.3d 174, 179 (Tex.App.--El Paso 2011, no pet.)(noting same standards). So long as more than a scintilla of evidence supports the finding below, we will uphold it and the legal sufficiency challenge will fail. *Wal-Mart Stores, Inc. v. Canchola*, 121 S.W.3d 735, 739 (Tex. 2003); *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex. 1995). Additionally, we must remember that the jurors are the sole judges of the weight and credibility of witness testimony, and if the evidence at trial would allow reasonable, fair-minded jurors to differ in their conclusions, then a reviewing court must allow jurors to do so. *City of Keller*, 168 S.W.3d at 810; *El Paso Independent School District v. Pabon*, 214 S.W.3d 37, 41 (Tex.App.--El Paso 2006, no pet.). Accordingly, so long as evidence falls within the zone of reasonable disagreement, a reviewing court cannot substitute its own judgment for that of the trier of fact. *City of Keller*, 168 S.W.3d at 819; *Pabon*, 214 S.W.3d at 41.

In a factual sufficiency review, we examine all the evidence in the record, both for and against the lower court's findings. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex. 1996); *Newberry v. Newberry*, 351 S.W.3d 552, 555-56 (Tex.App.--El Paso 2011, no pet.). We must consider and weigh all such evidence in a neutral light. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). We will reverse only if we conclude "that the verdict is so against the

great weight and preponderance of the evidence as to be manifestly unjust--this, regardless of whether the record contains some evidence of probative force in support of the verdict." *Id*.

Barbour sued WPI under the Texas Commission on Human Rights Act (TCHRA) *See* TEX.LAB.CODE ANN. § 21.051. An employer is prohibited from discharging, or in any other way discriminating against, an employee because of the employee's age.[5] *See* TEX.LAB.CODE ANN. § 21.051; *Canchola*, 121 S.W.3d at 739. One of the purposes of TCHRA is to "provide for the execution of the policies of Title VII of the Civil Rights Act of 1964." TEX.LAB.CODE ANN. § 21.001(1). In interpreting TCHRA, the Texas Supreme Court has consistently looked to analogous federal statutes and the cases interpreting them for guidance. *See Mission Consolidated Independent School District v. Garcia*, 372 S.W.3d 629, 633-34 (Tex. 2012), *citing Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 476 (Tex. 2001) and *NME Hosps., Inc. v. Rennels*, 994 S.W.2d 142, 144 (Tex. 1999).

Texas courts follow the approach set forth by the United States Supreme Court and recognize two alternative methods of proof in discriminatory treatment cases. *Mission Consol.* 372 S.W.3d at 634, *citing Quantum Chem.*, 47 S.W.3d at 476. Under the first method, a plaintiff proves discriminatory intent via direct evidence. *Mission Consol.*, 372 S.W.3d at 634. "Direct evidence is evidence that, if believed, proves the fact of discriminatory animus without inference

---

[5] In its entirety, Section 21.051, titled, "Discrimination by Employer" states:

> An employer commits an unlawful employment practice if because of race, color, disability, religion, sex, national origin, or age the employer:
>
> (1) fails or refuses to hire an individual, discharges an individual, or discriminates in any other manner against an individual in connection with compensation or the terms, conditions, or privileges of employment; or
>
> (2) limits, segregates, or classifies an employee or applicant for employment in a manner that would deprive or tend to deprive an individual of any employment opportunity or adversely affect in any other manner the status of an employee.

TEX.LAB.CODE ANN. § 21.051.

or presumption." *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897 (5th Cir. 2002). However, it is often difficult to prove "forbidden animus" through direct evidence. *See Mission Consol.*, 372 S.W.3d at 634 (recognizing that: "motives are often more covert than overt, making direct evidence of forbidden animus hard to come by") and *U.S. Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 716, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983)(noting that there will seldom be an eyewitness who can testify as to the employer's mental processes and therefore recognizing the difficultly in using direct evidence to prove the "state of a man's mind at a particular time"). In order to ease the burden on discrimination plaintiffs, the court created a second method of proof. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Mission Consol.*, 372 S.W.3d at 634. Accordingly, when there is no direct evidence of discriminatory intent, discrimination can be shown indirectly through a burden-shifting method of proof. *See McDonnell Douglas Corp.*, 411 U.S. at 801-03; 93 S.Ct. at 1820; *Mission Consol.*, 372 S.W.3d at 634. Under this second method, the plaintiff must first make a *prima facie* case showing that the plaintiff: (1) was discharged; (2) was qualified for the position from which she was discharged; (3) is a member of a protected class; and (4) was either replaced by someone outside the protected class, replaced by someone younger, or was otherwise discharged because of her age. *McDonnell Douglas Corp.*, 411 U.S. at 801-03, 93 S.Ct. at 1820. So long as a plaintiff meets the "minimal" initial burden of establishing a *prima facie* case of discrimination, she is entitled to a presumption of discrimination (the "*McDonnell Douglas* presumption"). *Mission Consol.*, 372 S.W.3d at 634, *citing Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) and *Canchola*, 121 S.W.3d at 739. "Although the precise elements of this showing will vary depending on the circumstances, the plaintiff's burden at this stage of the case is not onerous." *Mission Consol.*,

372 S.W.3d at 634, *quoting Burdine*, 450 U.S. at 253, 101 S.Ct. 1089 (internal quotations omitted). Once the plaintiff makes a *prima facie* showing, the burden shifts to the defendant to demonstrate a legitimate nondiscriminatory purpose for the employment action. *McDonnell Douglas Corp.*, 411 U.S. at 802-03, 93 S.Ct. 1824. If the defendant meets this burden, then the plaintiff must prove that the employer's stated reason for the adverse action was merely pretext for the real, discriminatory purpose. *Id.* However, where, as here, the case has been fully tried on the merits, we do **not** engage in the burden-shifting analysis. *Canchola*, 121 S.W.3d at 739; *Claymex Brick and Tile, Inc. v. Garza*, 216 S.W.3d 33, 36 (Tex.App.--San Antonio 2006, no pet.). "Instead, the evaluation process is streamlined and we proceed directly to whether the plaintiff presented enough evidence for a jury to find that discrimination occurred." *Claymex Brick and Tile, Inc.*, 216 S.W.3d at 36, *citing Cachola*, 121 S.W.3d at 739; *see also City of Austin Police Department v. Brown*, 96 S.W.3d 588, 596 (Tex.App.--Austin 2002, pet. dism'd)(noting that "an affirmative finding will be reviewed on appeal on the basis of whether the plaintiff produced sufficient evidence for the jury to find discrimination had occurred."). Therefore, in addressing WPI's first two issues, our inquiry is limited to whether the evidence is legally and/or factually sufficient to support the jury's finding that age was a motivating factor in WPI's decision to terminate Barbour.[6] *See Canchola*, 121 S.W.3d at 739.

A significant portion of WPI's argument is dedicated to the assertion that Barbour presented no evidence regarding the treatment of similarly situated employees. It thus contends that Barbour failed to establish the fourth element of a *prima facie* case of discrimination. In support of this argument, WPI relies heavily on the Supreme Court's opinion in *AutoZone, Inc. v. Reyes*, 272 S.W.3d 588 (Tex. 2008)(per curiam).

---

[6] At trial, Barbour bore the burden of establishing discriminatory intent. *Canchola*, 121 S.W.3d at 739. In other words, it was Barbour's burden to prove that her age was a motivating factor in WPI's decision to terminate her.

In *AutoZone*, Salvador Reyes sued his employer, alleging he was fired because of his age in violation of TCHRA. *AutoZone*, 272 S.W.3d at 590. Reyes was sixty-two years old when his employment was terminated. *Id.* His employer responded alleging that Reyes was fired for sexually harassing a female coworker. *Id.* A jury found in favor of Reyes and the Corpus Christi Court of Appeals affirmed. *Id.*; *see AutoZone, Inc. v. Reyes*, 272 S.W.3d 644, 648 (Tex.App.--Corpus Christi 2006), *rev'd*, 272 S.W.3d 588 (Tex. 2008)(per curiam). The Texas Supreme Court agreed with the employer that the evidence supporting the finding that age was a motivating factor in Reyes's discharge was legally insufficient and reversed the Court of Appeals. *AutoZone*, 272 S.W.3d at 591. WPI focuses on the Supreme Court's holding in *AutoZone* that the evidence failed to establish that the employer subjected the plaintiff to disparate discipline and "discriminated against [him] by treating him less favorably than similarly-situated younger employees" who violated the company's sexual harassment policy. *AutoZone*, 272 S.W.3d at 593-95. However, this was just a small portion of the Supreme Court's decision. WPI ignores the fact that under the very standard used in *AutoZone*, Barbour presented sufficient direct evidence of discriminatory animus.

The court's analysis in *AutoZone* began by discussing whether remarks made by a store manager constituted evidence of discrimination. *Id.* at 593-94. The employer argued that statements made to a parts service manager by a store manager that the employer intended to get rid of "the old people" were "stray remarks" made by an individual who was not part of and had no input into the decision to fire Reyes. *Id.* at 592. The Supreme Court specifically acknowledged that "remarks and statements *may serve as evidence of discrimination*," if they are: (1) related to the employee's protected class, (2) close in time to the employment decision, (3) made by an individual with authority over the employment decision, and (4) related to the

employment decision at issue. [Emphasis added]. *Id*. at 593. The court concluded that the evidence showed the store manager played no part in, had no leverage over, and exerted no influence concerning the employer's investigation or decision to fire the plaintiff.[7] *Id.* The Supreme Court also determined that no person involved in the investigation or subsequent termination decision ever spoke to or took a statement from the store manager, that the store manager "did not work in the store where the sexual harassment allegedly occurred," that the store manager had no authority over the plaintiff until the plaintiff was transferred to the manager's store while the harassment allegation was being investigated, and that the store manager testified at the trial that he had no involvement in the investigation or termination decision. *Id*. With respect to the store manager's "get rid of 'the old people'" statements, the Supreme Court found no evidence that the manager represented the employer's motive or intent.[8] *Id*. at 592.

The instant case is distinguishable. There was testimony that Montalvo made comments to Barbour that she was getting "old," about her having "gray hair," and about her "sagging breasts," and such comments were clearly related to Barbour's age, and because Barbour was over forty, they were related to her "protected class." Barbour also testified that Montalvo made these comments "nonstop," "three or four times a week" and "all the time," up until her termination. Since Barbour's alleged adverse employment action was her termination, these comments were certainly made in "proximate time to the adverse employment decision." In addition, Barbour testified that Montalvo made comments that the company "need[ed] to hire

---

[7] The termination decision was made by a regional manager on the basis of a recommendation made by a company employee relations specialist who had reviewed written statements obtained from the plaintiff, the coworker that was allegedly harassed by the plaintiff, and other employees. *AutoZone*, 272 S.W.3d at 591.

[8] The court also noted that at trial the store manager (who no longer worked for the employer) testified that he was only communicating his personal opinion that the employer was attempting to remove long-time managers who were not following the employer's policies. *AutoZone*, 272 S.W.3d at 592-93.

young Mexican girls." Montalvo's comments regarding Barbour's age and the need for "young Mexican girls" is "related to the employment decision at issue." Therefore, the only remaining question is whether Montalvo was an individual with authority over the employment decision at issue - i.e. Barbour's termination. *AutoZone*, 272 S.W.3d at 593; *Burton v. Carter Bloodcare*, 2012 WL 42899, *7 (Tex.App.--Fort Worth Jan. 5, 2012, no pet.). In contrast to *AutoZone*, there is sufficient evidence in this case to show that Montalvo possessed leverage over, and exerted influence over, WPI's decision to terminate Barbour.

"In determining whether the individual making the remark had authority over the employment decision, consideration is not limited to statements by the person who officially made the decision." *AutoZone*, 272 S.W.3d at 593, *citing Arismendez v. Nightingale Home Health Care, Inc.*, 493 F.3d 602, 608 (5th Cir. 2007) and *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 226-27 (5th Cir. 2000). Even if the person who made the comments is not the decision maker, if the evidence shows that person possessed leverage or exerted influence over the decision-maker, then the discriminatory animus may be imputed to an employer. *AutoZone*, 272 S.W.3d at 593, *citing Russell*, 235 F.3d at 226-27.

It is undisputed that Montalvo was WPI's production manager and that as such, he was responsible for personnel issues. Montalvo, Paul Shiller, and Candace Woodard were the only people present when Barbour was terminated. Montalvo was the only one who spoke and the one who actually informed Barbour she was fired.

There is also sufficient evidence showing that even if Montalvo was not directly responsible for the decision to terminate Barbour, he influenced the decision. WPI points to testimony that Della Williams was the one who made the decision to terminate Barbour, and that since Mrs. Williams was unaware of any comments made by Montalvo, there is no evidence of

discriminatory intent. But Montalvo himself testified that Mrs. Williams was not involved in the decision to terminate Barbour. The jury was free to disbelieve the testimony that Mrs. Williams alone made the termination decision.

Therefore, while a lack of evidence regarding the treatment of similarly situated employees could prevent Barbour from enjoying the benefit of the *prima facie* presumption, it does not preclude the possibility that Barbour presented sufficient direct evidence to show that age was a motivating factor in WPI's decision to terminate her. We find that Barbour presented such direct evidence of discriminatory intent via Montalvo's comments.[9]

Here, WPI asserted it Barbour was terminated for multiple reasons. First, WPI points to evidence that it fired Barbour based on two complaints from Barbour's "Line Lead," Tammy Renteria, that Barbour failed to follow written work orders. In addition, WPI points to the testimony of Della Williams wherein Ms. Williams stated that Barbour (1) had "missed a lot of work"; and (2) "had had a lot of conflict with a lot of different employees in the organization." However, all of the testimony supporting these contentions was directly contested by Barbour. As the judges of witness credibility and demeanor, the jury was free to believe or disbelieve the testimony.

We conclude that the evidence presented would allow a reasonable and fair-minded jury to find that Barbour's age was a motivating factor in WPI's decision to terminate her. Likewise, the jury's finding cannot be said to be so against the great weight of the evidence as to be clearly wrong or unjust. Issues One and Two are overruled.

---

[9] We acknowledge that the fact Barbour presented direct evidence of discriminatory intent did not automatically require a verdict in her favor. "[T]he existence of direct evidence only shifted the burdens of production and persuasion to [WPI] to show that it would have made the same employment decision regardless of [Barbour's] age." *See Brown*, 96 S.W.3d at 599 n.5, *citing Price Waterhouse v. Hopkins*, 490 U.S. 228, 244-45, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). Based on the jury's verdict, they failed to find that WPI would have done so.

We now turn to Barbour's cross-appeal. In a single issue, Barbour argues that the trial court erred by concluding that it lacked authority to enhance the amount of attorney's fees awarded to Barbour.

The parties agreed (pretrial) that, whatever the outcome, the trial court would determine the attorney's fee award. After the jury returned its verdict in favor of Barbour, Barbour filed a Motion for Attorney's Fees. In her motion, Barbour requested that the trial court award attorneys' fees through trial and post-verdict proceedings, as well as appellate attorney fees. Barbour also requested an enhancement of the base fee for both trial fees and any appellate fees. Specifically, Barbour requested that the trial court apply a multiplier of two (2) in determining reasonable attorneys' fees. WPI filed a response and objections to Barbour's motion.

On July 19, 2011, the trial court held a hearing on attorney's fees. The following day, the trial court issued its judgment awarding Barbour "reasonable and necessary attorney's fees" in the amount of $154,335. WPI requested findings of fact and conclusions of law. The trial court's findings of fact included findings that: (1) Barbour's attorneys spent a total of 545 hours and 45 minutes on Barbour's case (through the jury trial and post-verdict hearings and briefings); and (2) 514 hours and 45 minutes was a reasonable and necessary amount of hours. The trial court also found the reasonable hourly rates for Barbour's attorneys were: (1) $300 per hour for Jason Smith; (2) $300 an hour for Zoe Courtney; and (3) $200 an hour for John Brender. The trial court then stated a number of findings detailing the qualifications of the attorneys. Following such statements, the court, in finding of fact number 32, stated:

> The Court finds that Rhonda Barbour's reasonable and necessary attorneys' fees through the trial of this case and for post verdict hearings and briefing are One Hundred Fifty-Four Thousand Three Hundred Thirty-Five Dollars

($154,335.00).[10]

In its conclusions of law, the trial court specifically stated that Barbour should recover attorneys' fees in the amount of $154,335. On appeal, Barbour challenges only the trial court's final conclusion of law stating:

> The Court concludes that it is not authorized to utilize a multiplier in awarding attorneys' fees under Chapter 21.259, but finds that a 1.5 multiplier would be appropriate if an appellate court concludes otherwise.

Barbour argues that the trial court erred as a matter of law by concluding that it did not have the authority under Texas Labor Code Section 21.259 to apply a multiplier to enhance the amount of attorney's fees in an age discrimination case. Accordingly, Barbour asks us to render judgment applying a 1.5 multiplier to the attorneys' fee award.

### Standard of Review

We review challenges to a trial court's conclusions of law de novo. *Hitzelberger v. Samedan Oil Corp.*, 948 S.W.2d 497, 503 (Tex.App.--Waco 1997, pet. denied); *Piazza v. City of Granger*, 909 S.W.2d 529 (Tex.App.--Austin 1995, no writ.).

### Applicable Law

Under Section 21.259(a) of the Texas Labor Code, a prevailing party is entitled to recover reasonable attorney's fees as "part of the costs." *See* TEX.LAB.CODE ANN. §21.259(a). In a suit brought under Texas law, the method of assessing and awarding attorney fees is governed by Texas procedural rules. *State v. Anderson Courier Service*, 222 S.W.3d 62, 67 (Tex.App.--Austin 2005, pet. denied); *Dillard Department Stores, Inc. v. Gonzales*, 72 S.W.3d 398, 413 (Tex.App.--El Paso 2002, pet. denied). For suits brought under Section 21.259(a) of

---

[10] In its final three findings of fact (numbers 33-35), the trial court found: (1) should Barbour prevail on appeal, reasonable and necessary attorney's fees would be $30,000; (2) if the matter is further appealed by petition of review to the Supreme Court, reasonable and necessary attorneys' fees would be $12,000; and (3) if the Supreme Court grants Barbour's petition for review, reasonable and necessary attorneys' fees would be an additional $30,000, "in the event she should prevail."

TCHRA, Texas courts have adopted the "lodestar" method for calculating the amount of fees to award.[11] *See, e.g., Dillard Department Stores, Inc. v. Gonzales*, 72 S.W.3d 398, 412 (Tex.App.--El Paso 2002, pet. denied); *West Telemarketing Corporation Outbound v. McClure*, 225 S.W.3d 658, 675-76 (Tex.App.--El Paso 2006, pet. granted, judgm't vacated w.r.m.).

In *El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757 (Tex. 2012), the Texas Supreme Court explained that determining what constitutes a reasonable fee under the lodestar method is a two-step process. *El Apple I, Ltd*, 370 S.W.3d at 759. In step one, the court determines the reasonable number of hours spent by counsel on the case and a reasonable hourly rate for the work performed. *Id*. The court then multiplies the number of hours reasonably expended by the reasonable hourly rate to arrive at the lodestar. *Id*. In step two, the court considers whether certain factors merit an upward or downward adjustment of the lodestar in order to reach a reasonable fee award. *Id*.

In setting forth this process, the court acknowledged and accepted the presumption that the lodestar produces a reasonable fee. *El Apple I, Ltd.*, 370 S.W.3d at 759. However, it recognized that "exceptional circumstances may justify enhancements to the base lodestar" *Id*. In other words, once the base lodestar has been calculated, a court may raise or lower the lodestar amount if certain relevant factors indicate an adjustment is necessary.

The relevant factors the court may consider in determining whether an adjustment is

---

[11] The remedies provided under TCHRA mirror those available under those available in federal employment discrimination law. *Compare* TEX.LAB.CODE ANN. §§ 21.258, 21.2585, 21.259(a) *with* 42 U.S.C. §§ 1981a, 2000e-5(g), 2000e-5(k). As noted above, one purpose of TCHRA is to harmonize state and federal employment discrimination law. TEX.LAB.CODE ANN. § 21.001(1). Therefore, while state procedural rules govern the determination of attorney's fees in a suit brought under state law, Texas courts have looked to federal law in applying Section 21.259(a) of TCHRA. *See, e.g., Southwestern Bell Mobile Sys., Inc. v. Franco*, 971 S.W.2d 52, 55-56 (Tex. 1998); *Burgmann Seals America, Inc. v. Cadenhead*, 135 S.W.3d 854, 860-61 (Tex.App.--Houston [1st Dist.] 2004, pet. denied); *Elgaghil v. Tarrant County Junior College*, 45 S.W.3d 133, 144-45 (Tex.App.--Fort Worth 2000, pet. denied). Federal courts use the lodestar method in awarding attorney's fees. *See, e.g., Dillard Departmentt Stores, Inc. v. Gonzales*, 72 S.W.3d 398, 412 (Tex.App.--El Paso 2002, pet. denied); *West Telemarketing Corp. Outbound*, 225 S.W.3d at 675-76.

necessary are found in the Texas Disciplinary Rules of Professional Conduct.  Such factors include:  (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly; (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer; (3) the fee customarily charged in the locality for similar legal services; (4) the amount involved and the results obtained; (5) the time limitations imposed by the client or by the circumstances; (6) the nature and length of the professional relationship with the client; (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and (8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.  *El Apple I, Ltd.*, 370 S.W.3d at 761.

These factors mirror those set out by the Fifth Circuit in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974), *overruled on other grounds by Blanchard v. Bergeron*, 489 U.S. 87, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989).  In *Johnson*, the Fifth Circuit explained that the lodestar may not be adjusted due to a *Johnson* factor if that factor was already considered in determining the base lodestar amount.  *Johnson*, 488 S.W.2d at 717-19; *see also Dillard Department Stores, Inc.*, 72 S.W.3d at 412 (noting that if some of the *Johnson* factors are accounted for in the lodestar amount, they should not be considered when making adjustments).  In addition, the United States Supreme Court has explained that while a lodestar may be adjusted, such adjustments are appropriate only in "rare circumstances."  *Perdue v. Kenny A*, 559 U.S. 542, 130 S.Ct. 1662, 1673, 176 L.Ed.2d 494 (2010).  The court went on to state that the "lodestar figure [already] includes most, if not all, of the relevant factors constituting a 'reasonable' attorney's fee."  *Id*.

In calculating attorney's fees under lodestar, the party applying for the award bears "the

burden of documenting the hours expended on the litigation and the value of those hours." *See El Apple I.*, 370 S.W.3d at 761, *citing Hensley v. Eckerhart*, 461 U.S. 424, 437, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). Generally, an attorney meets this burden by providing documentation evidencing the time expended on the case and reasonable hourly rates. In calculating an award, the trial court should obtain sufficient information to make a meaningful evaluation of the application for attorney's fees, and should exclude charges for duplicative, excessive, or inadequately documented work. *Watkins v. Fordice*, 7 F.3d 453, 457 (5th Cir. 1993). Generally, the award of attorney's fees is within the trial court's sound discretion. *See El Apple I.*, 370 S.W.3d at 761, *citing Ragsdale v. Progressive Voters League*, 801 S.W.2d 880, 881 (Tex. 1990)(per curiam).

## *Analysis*

Barbour does not specifically challenge the trial court's judgment awarding "reasonable and necessary" attorney's fees in the amount of $154,335, nor does she challenge the trial court's findings of fact that such amount is "reasonable and necessary." She does not argue that the trial court abused its discretion in calculating the amount of the award, or otherwise assert a challenge to the sufficiency of the evidence supporting the trial court's award. Instead, she contends that the trial court erred as a matter of law by concluding that it was not authorized to utilize a multiplier in awarding attorney's fees under Section 21.259. Barbour relies on the Texas Supreme Court's decision in *El Apple I* and argues that it confirms that the trial court below erred in concluding that it was not authorized to utilize a multiplier.

While *El Apple* acknowledges that a multiplier may be applied to the lodestar amount in cases filed under the Texas Labor Code, it specified that only "exceptional circumstances may justify enhancements to the base lodestar." *El Apple I*, *Ltd.*, 370 S.W.3d at 760. To justify

adjusting the lodestar figure, the court must rely on factors such as the complexity of the case, the skill of the attorney, whether the fee is contingent, and the novelty of the issues raised. The problem here is that the findings of fact indicate that the trial court relied on each one of these factors in determining the lodestar. Barbour does not point to any additional evidence indicating exceptional circumstances existed which would warrant utilization of a multiplier. Likewise, we do not find any indication that Barbour's counsel ever identified which factors supported the use of a multiplier, separate and distinct from those use to calculate the base lodestar.

The trial court specifically and repeatedly referred to the fees awarded as "reasonable and necessary." Under Texas law, that is all the trial court is authorized to award. Finding no error, we overrule Barbour's sole point and affirm the judgment.

March 20, 2013

ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Rivera, and Antcliff, JJ.
Antcliff, J., not participating