

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| TEXAS HEALTH AND HUMAN SERVICES COMMISSION, | § | No. 08-19-00279-CV |
| | § | |
| Appellant, | § | Appeal from the |
| | § | County Court at Law No. 6 |
| v. | § | |
| | § | of El Paso, Texas |
| MARIA ENRIQUEZ, | § | |
| | § | (TC # 2017-DCV-3698) |
| Appellee. | § | |

**O P I N I O N**

Appellee Maria Enriquez ("Enriquez") was terminated from her position as a custodian at the El Paso State Supported Living Center (the "Center") for allegedly stealing an iPad belonging to one of the Center's residents. She thereafter filed a lawsuit against Appellant Texas Health and Human Services Commission ("THHSC"), the umbrella agency under which the Center operates, alleging that she was wrongfully terminated, raising, among others, a claim of retaliation. THHSC filed a plea to the jurisdiction, contending that Enriquez did not have sufficient jurisdictional evidence to support her several claims. The trial court granted THHSC's motion as to all but the retaliation claim. For the reasons set forth below, we conclude that Enriquez failed to overcome THHSC's proffered reason for the termination and show that but for her protected

conduct that she would not have been terminated when she was. We therefore reverse the trial court's order and render judgment dismissing Enriquez's claims for lack of jurisdiction.

## I. FACTUAL BACKGROUND

### A. The Alleged Theft

The Center is home to approximately 130 residents who suffer from various intellectual and developmental disabilities. Enriquez was employed as a custodian from April 2001 until she was terminated in February of 2017. The Center's residents live in residential units, commonly referred to as cottages. One morning in September 2016, a THHSC employee, Patricia Cordero, observed a resident in cottage #512 mishandling an iPad. Cordero thereafter placed the iPad in a closet in the cottage's unlocked janitorial storage room for safekeeping. The next morning, Cordero saw that the iPad was missing, and initiated a search and internal investigation, which included a review of surveillance camera footage from the day before by one of the Center's security camera monitors. The camera footage documented Cordero placing the iPad in the janitorial closet earlier in the day, and later observed Enriquez, who was assigned to clean cottage #512, enter the closet with a maintenance cart. Enriquez could then be observed taking a plastic bag from the cart and placing a black square object in the cart while in the closet. The camera footage further showed Enriquez push the cart into the laundry room adjacent to the closet, and then exit the area with a black object resembling an iPad wrapped in a plastic bag under her arm. Enriquez later returned to the area with no object in hand.

The next day an investigation was initiated by the Office of Inspector General ("OIG") into whether Enriquez had committed theft or exploitation. As per THHSC's policy, Enriquez was temporarily reassigned to a different job pending the results of the OIG investigation.

2

**B. The OIG's Investigation**

The OIG Investigator, Efrain Sianez, independently reviewed the surveillance footage and concluded that Enriquez took a black object resembling an iPad from the janitorial closet shortly after Cordero had placed it there. He noted that Enriquez was the only person seen on the footage leaving the closet with a similar object that day.[1] Sianez interviewed Enriquez, who denied taking the iPad, and who claimed that she left the closet with a crossword puzzle book wrapped in a black plastic bag under her arm. With Enriquez's permission, Sianez later went to Enriquez's home, where she showed him a red and white puzzle book that she claimed was the object she had carried out of the closet. However, Sianez did not believe the book resembled the object Enriquez had been carrying on the surveillance footage.[2] In addition, Sianez interviewed Cordero, who expressed her opinion that the object Enriquez was carrying in the surveillance footage was the missing iPad she had placed in the closet earlier that day.

With Enriquez's consent, Sianez subsequently arranged for her to take a polygraph examination at the El Paso County Sheriff's office. Enriquez responded in the negative each time the examiner asked her if she had stolen the iPad or if she knew who had stolen it. Based on her responses, the examiner concluded that Enriquez's test results were "DI (Deception Indicated)," and that she had "failed the polygraph."

In a November 20, 2016 report, Sianez concluded that the "facts of the case disclosed that Enriquez took an object that resembled an iPad outside cottage 512." And he further testified at

---

[1] The surveillance footage is not part of the appellate record, but still photos taken from the footage are included as exhibits to the report prepared by the OIG.

[2] For comparative purposes, the record contains a photograph that Sianez took of Enriquez holding the puzzle book under her arm side by side with a still photograph taken from the surveillance footage of Enriquez leaving the janitorial closet with the object under her arm on the day of the theft.

3

his deposition that believed he had probable cause to charge Enriquez with the theft. However, he explained that he did not do so because he could not determine "with certainty" that the object Enriquez carried out of the janitorial closet was the "specific" iPad in question. Instead, he would have preferred to have a "closer visual" of the iPad for identification purposes. He therefore concluded his report by finding that the "theft/exploitation" charge against Enriquez was "unsubstantiated."

In a February 1, 2017 supplemental report, Sianez recounts that the iPad was found in early November 2016 in a trash bin at a local park and subsequently returned to the Center. After being informed of the iPad's return, Sianez contacted the El Paso Police Department on November 29, 2016, and requested that they process the iPad for fingerprints. Enriquez's fingerprints were not found on the iPad, and the police were unable to identify a suspect through their "Automated Fingerprint Identification System."

### C. The Termination

On January 11, 2017, the Center's Housekeeping Manager, Luis Martinez, provided Enriquez with a "Disciplinary Action Notice." The Notice stated that Enriquez was observed on the Center's surveillance video removing a resident's iPad from the janitorial closet in violation of THHSC's policy prohibiting employees from stealing items, and stated that Martinez had determined that disciplinary action was appropriate. The Notice warned that in accordance with THHSC's policies, "theft or other unlawful activity," would "most likely result in dismissal from employment." The Notice informed Enriquez that she had the opportunity to submit a verbal or written rebuttal to the allegation against her.

In her written rebuttal, dated January 16, 2017, Enriquez denied the allegation, and further claimed that her rights were violated during the investigation, contending that she had been

4

"harassed" and "intimidate[d]" during the investigation, that she had taken the polygraph test without knowing her rights, and that her rights had been violated by an "unreasonable search in [her] home." In addition, she asserted that the Center had used the missing iPad as an "opportunity to get rid of an unpopular employee." But she made no claim that her termination was the result of age discrimination or retaliation at that time.

In a letter dated January 17, 2017, Martinez notified Enriquez that she was being terminated from her employment, effective February 9, 2017. The letter stated that prior to making his termination decision, Martinez had met with Enriquez that same day to review her rebuttal information, and that after "reviewing [her] rebuttal and considering all the relevant facts," he determined that she had stolen the resident's iPad and had thereby violated THHSC's work rules. He further provided Enriquez with information regarding how to file an appeal to contest his decision.

Enriquez appealed the decision, and following a hearing, an administrative law judge issued a final order sustaining her termination. In findings of fact and conclusions of law, the administrative law judge found that the "preponderance of the evidence suggests that [Enriquez] is the person who removed the iPad from the cabinet." The judge further concluded that Enriquez had committed the theft in violation of THHSC's policies, and that her dismissal was therefore proper.

## II. PROCEDURAL BACKGROUND

### A. Enriquez's 2017 Texas Workforce Commission Complaint

On March 14, 2017, Enriquez filed an EEOC complaint with the Texas Workforce Commission, alleging that she had been wrongfully terminated, raising claims of age discrimination and unlawful retaliation for participating in a "protected activity" under the Texas

5

Commission on Human Rights Act ("TCHRA"). In her complaint, Enriquez contended that throughout her employment at the Center she had been "treated differently due to [her] age," and that she had previously complained that her supervisors, Irene Megliorino and Patricia Cordero, "were constantly yelling at and humiliating" her because she was not working fast enough. In response, THHSC acknowledged that Enriquez had filed an EEOC complaint on September 16, 2011, accusing Megliorino of age discrimination. THHSC also acknowledged that Enriquez had in 2015 and 2016 filed a series of internal or administrative complaints within the agency against Megliorino and other supervisors but argued that those complaints only raised management issues and did not allege that she was the victim of age discrimination or report any other unlawful activities.

**B**. **The Lawsuit**

After the Workforce Commission issued a right to sue letter, Enriquez filed her wrongful termination lawsuit against THHSC, alleging age discrimination, unlawful retaliation for engaging in protected activities, and a hostile work environment. After engaging in discovery proceedings, THHSC filed a plea to the jurisdiction, arguing that the evidence did not support a finding that Enriquez had been terminated for any unlawful reason, and that the true cause of her termination was the theft of the iPad. Enriquez responded, claiming that she had come forward with sufficient jurisdictional evidence to support her claims. Both parties submitted voluminous exhibits in support of their positions.

Following a hearing, the trial court granted THHSC's plea to the jurisdiction with regard to Enriquez's claims of age discrimination and hostile work environment and dismissed those two claims but denied the plea with respect to the unlawful retaliation claim. THHSC filed an appeal from the trial court's order, but Enriquez did not.

6

# III. ISSUES ON APPEAL

THHSC raises two issues on appeal. First, it contends that Enriquez failed to come forward with sufficient jurisdictional evidence to support a prima facie case of unlawful retaliation. Second, THHSC contends that even if Enriquez met her burden of establishing a prima facie retaliation claim, it established a legitimate, non-discriminatory and non-retaliatory reason for Enriquez's termination, i.e., her alleged theft of the iPad. And as part of its second argument, THHSC further contends that Enriquez failed to establish that THHSC's stated reason for the termination was a pretext for her termination. Because we agree with THHSC on its second issue, we need not address the first issue.

# IV. APPLICABLE LAW AND STANDARD OF REVIEW

## A. Governmental Immunity and Pleas to the Jurisdiction

State agencies, such as THHSC, are protected by sovereign immunity from lawsuits other than for claims for which their immunity has been waived by the legislature. *Texas Dep't of Aging and Disability Services v. Lagunas*, 546 S.W.3d 239, 246 (Tex.App.--El Paso 2017, no pet.) *citing Texas Parks & Wildlife Dep't v. Sawyer Trust*, 354 S.W.3d 384, 388 (Tex. 2011). Absent a waiver, a governmental unit's sovereign immunity deprives a trial court of subject matter jurisdiction. *Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 224 (Tex. 2004). The Texas Legislature has, however, created a limited waiver of immunity for discrimination claims brought under the TCHRA. *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 636 (Tex. 2012). That waiver, however, extends "only for those suits where the plaintiff actually alleges a violation of the TCHRA by pleading facts that state a claim thereunder." *Id*.

A governmental entity may challenge the validity of a plaintiff's claim through a plea to the jurisdiction. *Miranda*, 133 S.W.3d at 225-26. A plea may attack the face of the pleading,

but may also include evidence which thereby places into issue the existence of a jurisdictional fact. *Id.* at 226-27. When, as here, a plea to the jurisdiction challenges the existence of jurisdictional facts, we consider all the relevant evidence submitted by the parties. *Id.* "If there is no question of fact as to the jurisdictional issue, the trial court must rule on the plea to the jurisdiction as a matter of law." *City of El Paso v. Heinrich*, 284 S.W.3d 366, 378 (Tex. 2009). On the other hand, if the jurisdictional evidence creates a fact question, then the trial court cannot grant the plea to the jurisdiction, and the issue must be resolved by the fact finder. *Texas Dep't of Aging and Disability Services v. Lagunas*, 618 S.W.3d 845, 852 (Tex.App.--El Paso 2020, no pet.). Our review of the trial court's decision mirrors that of our review of summary judgments, which we review de novo, accepting as true all evidence favorable to the non-movant, and indulging every reasonable inference and resolving any doubts in the non-movant's favor. *Id.*, *citing Miranda*, 133 S.W.3d at 226-27; *State Dep't of Highways and Public Transp. v. Gonzalez*, 82 S.W.3d 322, 327 (Tex. 2002).

### B. Proving TCHRA Discrimination Claims

The TCHRA prohibits an employer, including a state agency, from discriminating against a person on the basis of age, in connection with compensation or with the terms, conditions, or privileges of employment. TEX.LAB.CODE ANN. § 21.051. An "employer" includes "a county, municipality, state agency, or state instrumentality, regardless of the number of individuals employed." *Id.* § 21.002(8)(D). It also prohibits an employer from retaliating or discriminating against a person who has engaged in protected activity such as opposing a discriminatory practice or making a charge of discrimination. *Id*. § 21.055; *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 781 (Tex. 2018) (recognizing that, as a "companion to its anti-discrimination provision, the TCHRA prohibits retaliation against an employee for engaging in certain protected

8

activities, such as reporting sexual harassment."); *County of El Paso v. Aguilar*, 600 S.W.3d 62, 82-83 (Tex.App.--El Paso 2020, no pet.) ("The TCHRA prohibits an employer from retaliating against an employee for engaging in protected activity such as opposing a discriminatory practice or making a charge of discrimination.").

In determining whether a plaintiff has a valid claim under the TCHRA for either discrimination or unlawful retaliation, Texas courts recognize two alternative methods of proof. *See Williams-Pyro, Inc. v. Barbour*, 408 S.W.3d 467, 477-79 (Tex.App.--El Paso 2013, pet. denied), *citing Mission Consol.*, 372 S.W.3d at 634. First, a plaintiff may prove unlawful discriminatory or retaliatory intent via direct evidence. *Williams-Pyro*, 408 S.W.3d at 478. "Direct evidence is evidence that, if believed, proves the fact of discriminatory animus without inference or presumption." *Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 476 (Tex. 2001). However, as courts have recognized, it is often difficult to prove "discriminatory animus" through direct evidence. *Id.*; *see also Clark*, 544 S.W.3d at 782 (recognizing that "smoking guns are hard to come by" in discrimination and unlawful retaliation cases).

Because of this, Texas courts have developed a second method of establishing a claim under the TCHRA, which follows the burden-shifting mechanism described in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). That paradigm allows the plaintiff to establish her case through circumstantial evidence. *See Clark*, 544 S.W.3d at 782 (applying *McDonnell Douglas* framework to unlawful retaliation cases). Under this method, commonly referred to as the "*McDonnell Douglas*" framework, the plaintiff must first come forward with sufficient jurisdictional evidence to establish a prima facie case on each element of her claim. *See id*. And if the plaintiff meets this burden, discrimination is presumed, and the burden then shifts to the employer to "articulate some legitimate, nondiscriminatory reason for the employee's

rejection." *Madden v. El Paso Indep. Sch. Dist.*, 473 S.W.3d 355, 360 (Tex.App.--El Paso 2015, no pet.), *citing Quantum Chem. Corp.*, 47 S.W.3d at 477. Once an employer offers an ostensibly legitimate reason for their actions, the presumption disappears, and "[t]he burden then shifts back to the complainant to show that the employer's stated reason was a pretext for discrimination." *Madden*, 473 S.W.3d at 360, *citing Quantum Chem. Corp.*, 47 S.W.3d at 477. To establish a fact question on the issue of pretext, the plaintiff must present evidence, which when viewed as a whole, would support a finding that the non-discriminatory reason given by the employer was false or not credible, and that the "real reason for the employment action was unlawful discrimination." *Madden*, 473 S.W.3d at 360-361.

### C. Elements of a Retaliation Claim

An employer is prohibited from retaliating or discriminating against a person who opposes a discriminatory practice, makes or files a charge, or files a complaint. TEX.LAB.CODE ANN. § 21.055. A retaliation claim is related to, but distinct from, a discrimination claim, and one may be viable even when the other is not. *Clark*, 544 S.W.3d at 763-64, 781. Unlike a discrimination claim, a retaliation claim focuses on the employer's response to an employee's protected activity, such as making a discrimination complaint, rather than on the validity of the underlying discrimination complaint. *Id.*

Recognizing that Enriquez has no direct evidence that THHSC had a retaliatory motive for terminating her, the parties agree that we must apply the *McDonnell Douglas* burden shifting framework to determine if she has a valid claim of retaliation under the TCHRA that waives THHSC's immunity. To establish a prima facie case of unlawful retaliation, an employee must show: (1) she engaged in an activity protected by the TCHRA; (2) she experienced a material adverse employment action; and (3) a causal link exists between the protected activity and the

10

adverse action. *Clark*, 544 S.W.3d at 782, *citing Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 67-68 (2006).[3] If the employee makes that showing, a rebuttable presumption of discrimination arises, which can alone sustain a discrimination claim. *Clark*, 544 S.W.3d at 782. The employer, then "can defeat this presumption merely by producing evidence of a legitimate, nondiscriminatory reason for the disputed employment action." *Id*. "Once rebutted, the presumption disappears, and an employee lacking direct evidence cannot prove a statutory violation without evidence that the employer's stated reason is false and a pretext for discrimination." *Id*.

Two causation standards are at play, the more onerous standard when the employer has evidenced a non-discriminatory basis for the employment action:

> The causation standard for the *McDonnell Douglas* prima-facie-case element is not onerous and can be satisfied merely by proving close timing between the protected activity and the adverse action. However, if the employer provides evidence of a legitimate reason for the adverse action, under the federal standard, the employee must prove the adverse action would not have occurred "but for" the protected activity. The but-for causation standard is significantly more difficult to prove than prima facie causation.

*Clark*, 544 S.W.3d at 782 (footnotes omitted). The "but for" standard was recently reaffirmed by the court in *Apache Corp. v. Davis*, No. 19-0410, 2021 WL 2603824, at *1 (Tex. June 25, 2021).[4]

But how to apply that standard to the facts in a given case? In *Alamo Heights v. Clark*, the court identified a series of factors useful in analyzing the causal link:

> In evaluating but-for causation evidence in retaliation cases, we examine all of the circumstances, including temporal proximity between the protected activity and the adverse action, knowledge of the protected activity, expression of a negative

---

[3] In determining whether a plaintiff has set forth a valid claim of discrimination or retaliation under the TCHRA, we rely on both State and Federal authorities, as Texas courts have recognized that one of the purposes of the TCHRA is to "provide for the execution of the policies of Title VII" of the Civil Rights Act of 1964, making it appropriate to look to federal law "to inform our construction and application of the TCHRA[.]" *See Clark*, 544 S.W.3d at 764, n.5.

[4] In its opinion, the court traced the "but for" causation standard back to *Texas Dep't of Human Services of State of Texas v. Hinds*, 904 S.W.2d 629, 636 (Tex. 1995) and more recently reaffirmed in *Office of Attorney General v. Rodriguez*, 605 S.W.3d 183, 192 (Tex. 2020).

attitude toward the employee's protected activity, failure to adhere to relevant established company policies, discriminatory treatment in comparison to similarly situated employees, and evidence the employer's stated reason is false.

544 S.W.3d at 790.

And more recently in *Apache Corp. v. Davis*, the court emphasized that the "factors" are not a replacement for the "but for" causation standard. Moreover, "[t]he factors may be more helpful in some cases and less in others. Some of the factors may actually be a distraction." 2021 WL 2603824, at *9. "More importantly, determining but-for causation cannot be a matter of weighing—or worse, counting—factors that may be helpful in analyzing circumstantial evidence in some situations." 2021 WL 2603824, at *10. Rather, our focus must be on whether "but for" the protected activity, the termination would not have occurred when it did.

## V. DISCUSSION

In support of its jurisdictional plea, THHSC produced evidence (1) challenging Enriquez's prima facie case of retaliation, (2) asserting a nonretaliatory reason for the adverse employment action, and (3) challenging causation between the alleged protected activities and the adverse employment actions. We therefore must consider the jurisdictional evidence as it relates to all elements of the circumstantial case. *Clark*, 544 S.W.3d at 783.

Even assuming that Enriquez made out a prima facie case, we turn to the evidence that THHSC produced explaining its action, namely that it believed Enriquez stole an iPad from the workplace. Once that evidence rebutted the presumption from the prima facie case, Enriquez carried the burden to raise a fact issue that this reason was a pretext and that she would not have been terminated but for exercising her protected activity. *Id.* In analyzing the relevant factors as a whole, we find that Enriquez has failed to raise a genuine issue of fact on the issue of causation between her claim of protected activity and her termination.

12

### A. Temporal Proximity

THHSC first contends that there is a lack of temporal proximity between any protected activity and Enriquez's February 2017 termination. We start with a brief summary of the alleged protected activity that forms the basis of Enriquez's retaliation claim.

On August 2, 2011, (five years prior to the stolen-iPad investigation), Irene Megliorino, who held the title "Custodian III" and "Custodial Supervisor" authored and sent to Enriquez, who was titled a "Custodian I" employee, a four-page "Third-Level Reminder Memo." The memo described seven incidents of insubordination occurring between 2004-2011 that were allegedly committed by Enriquez. The memo reflects that Megliorino gave Enriquez a day off to "to decide whether or not [she] really wanted to continue [her] employment with the agency." Further, Enriquez "would need to commit to correcting the problem, maintain an acceptable level of performance and behavior, and follow all of the agency's work rules" or failing that, face termination. The memo indicated Enriquez returned to work the next day, but she was placed on a "formal corrective process" which made her ineligible for certain benefits for twelve months. The memo was copied to David Reyes, the then Housekeeping Manager, and Martin Bombach, the then HR Director.

On September 16, 2011, in response to this disciplinary action, Enriquez filed an age-discrimination complaint with the Texas Workforce Commission alleging that Megliorino told her she was "too old" and that Enriquez (who was 58 at the time) should "go home so [she] can let younger people work." According to Enriquez, Megliorino was subsequently "demoted" and her supervisory authority over Enriquez and the other "Custodian 1" employees was removed.

Starting four years later, Enriquez filed a series of complaints with the agency, several of which complained that she was being treated unfairly by Megliorino who was apparently reasserting a supervisory role over Enriquez. We summarize these complaints below:

1. **February 17, 2015**: A complaint made by Enriquez and three other custodians, all over the age of 40, complaining that Megliorino had treated them "unfairly" in the past, and had engaged in "favoritism." They expressed confusion over whether Megliorino was their current supervisor, or whether she would be in the future, stating that after Enriquez's 2011 EEOC complaint was dismissed, Enriquez was told that Megliorino was not a "supervisor." They expressed concern that if she were to again become their supervisor, she would "belittle" them, "discriminate" against them, and "continue her intimidating tactics."

2. **November 10, 2015**: An administrative complaint filed by Enriquez against David Reyes and Karen McCluskey (then Assistant Director of Administration), complaining that they were unevenly and unfairly assigning work to the custodial staff.

3. **July 8, 2016**: An administrative complaint filed by Enriquez and the same three other custodians over the age of 40, to Jane Purcell, the Center's Director, complaining that Megliorino, who they believed was their temporary supervisor at the time, was generally a bad manager, and was continuing to engage in favoritism, allowing her favorite employees (such as her son-in-law) to select their working hours and giving them extra assistance from contract workers. In this internal complaint the foursome expressed frustration that despite having "repeatedly brought concerns and issues to Karen McCluskey regarding Irene Megliorino about how she is managing her temporary post," they had received no satisfactory response.

4. **July 11, 2016.** The foursome submitted an "amendment" to their complaint claiming they had been excluded from two meetings held by McCluskey with other custodians and that McCluskey was asking custodians whether they would like Megliorino to assume the role of Housekeeping Supervisor. While the complaint was apparently received, no formal written response to this complaint appears in the record, which suggests it remained pending.

5. **July 22, 2016**: An administrative complaint filed by Enriquez, complaining that Megliorino had treated her in an unprofessional manner, had yelled at her, had berated her in front of other employees and a resident, and had generally embarrassed and harassed her. After her complaint was deemed unsubstantiated, Enriquez was advised that she and Megliorino could go to mediation to resolve any "personal conflict[s]" they were having. Enriquez filed an "Response to Appeal" on August 19, 2016, contending that their issues extended beyond a "personal conflict," and that Megliorino had been continually harassing and belittling her and other "employees she does not like."

14

The next significant event occurred approximately thirty days later on September 14, 2016, when the iPad was reported stolen and Enriquez was removed from her regular duties. That set into motion the chain of events leading to the February 2017 termination.

While Enriquez's September 2011 EEOC complaint clearly qualified as protected activity, THHSC contends the later complaints pertain to routine work disputes centering on allegations of mismanagement, harassment, and unprofessional conduct, but not anything that put THHSC on notice of age an discrimination claim. *See e.g. County of Travis v. Manion*, No. 03-11-00533-CV, 2012 WL 1839399, at *6 (Tex.App.--Austin May 17, 2012, no pet.) (mem. op.) (where employer's complaint referred once to "discriminatory treatment" and complained that she had been harassed and treated in a "hostile" manner, the complaint contained no suggestion that would have put the employer on notice that she was complaining that her treatment was the result of sexual discrimination). As such, THHSC contends the 2015-2016 complaints cannot be considered protected activities and used for the purposes of temporal proximity.

Enriquez, however, contends that these complaints all related back to her 2011 EEOC claim of age discrimination, and that they sufficiently alerted THHSC that she was reporting unlawful activity. The gist of the argument is that Megliorino discriminated against Enriquez based on age in 2011--was removed from a supervisory role--and when Megliorino reasserted a supervisory role in 2015, the age discrimination started again. Enriquez's February 20, 2015, complaint specifically references her 2011 EEOC complaint. Therefore, Megliorino is a common thread that ties the 2015-2016 complaints to the original EEOC allegation.

Viewing the evidence in the light most favorable to Enriquez, we conclude the proximity in time factor tilts in her favor. The 2011 EEOC complaint by itself would not meet the time-proximity requirement. *See Clark*, 544 S.W.3d. at 790 (a gap of eight months is generally "so

15

long as to be of little, if any, probative value"); *Fields v. Teamsters Local Union No. 988*, 23 S.W.3d 517, 529 (Tex.App.--Houston [1st Dist.] 2000, pet. denied) (upholding temporal proximity as evidence of causation when the protected activity and adverse employment action were "separated by weeks, as opposed to months"). But to the extent that Enriquez can tie all the events together, she can relate the 2011 EEOC filing to the July 2016 complaints that are within two months of the iPad theft, and six months of the termination. That two-step process weakens, but does not entirely disprove the possible connection.[5]

## B. Knowledge of the Protected Activity

In order to establish a causal connection between an employee's protected activity and an adverse employment action, the focus is on the final decision-makers and what knowledge, if any, they had at the time of the adverse action. *See Marsaglia v. University of Texas, El Paso*, 22 S.W.3d 1, 5 (Tex.App.--El Paso 1999, pet. denied) (summary judgment in favor of employer in retaliation case affirmed where employee failed to produce evidence that decision-maker had knowledge of her protected activity, and where decision-maker filed an affidavit denying he had any such knowledge); *see also Ackel v. Nat'l Communications, Inc.*, 339 F.3d 376, 385 (5th Cir. 2003) (granting summary judgment in favor of employer on retaliation claim where employee had no evidence that decision-maker was aware of employee's protected activity).

The three persons principally involved in the termination decision process were Luis Martinez, the Housekeeping/Custodial Manager, Kevin Ward, the interim Assistant Director of Administration (ADOA), and the facility Director, Jane Purcell.[6] THHSC points out that there is

---

[5] We note, however, that the strength of the temporal connection is further weakened by the intervening OIG report, dated November 20, 2016, which develops and elaborates on the evidence against Enriquez. The actual termination decision then followed the OIG report.

[6] THHSC's Legal Department was also involved in the disciplinary action process, as required by THHSC policy.

nothing in the record to demonstrate that any of these three individuals had any knowledge of the 2011 complaint. First, Martinez testified in his deposition that he was hired in August of 2016 as the custodial manager, and therefore had no direct knowledge of what occurred prior to that time. Martinez acknowledged that Karen McCluskey, who at the time was an Assistant Director of Administration, informed him after he was hired that Enriquez and others had complained that Megliorino had treated the custodial staff in a belittling or rude manner; however, Martinez expressly denied having any knowledge that Enriquez had complained of age discrimination, or that she had previously filed an EEOC complaint with the Workforce Commission.[7]

Second, there is no evidence that Kevin Ward, who was Martinez's supervisor at the time, and who assisted Martinez in handling the termination process, was aware of the 2011 EEOC complaint. To the contrary, Ward testified during his deposition that he was first hired at the Center to serve as the interim assistant director of administration in October of 2016, after Enriquez had filed her various complaints, and that he had no knowledge of any of her complaints, including her 2011 EEOC complaint at the time of her termination. And finally, there is nothing in the record to indicate that Jane Purcell, who was the Center's director at the time, and who authorized Ward to proceed with the termination process in December of 2016, had any knowledge of the 2011 EEOC complaint.[8] She was the only person directly connected to the July 2016 complaints.

Accordingly, because there is no evidence in the record that any of the final decision-makers had any knowledge of Enriquez's age discrimination allegations, this factor weighs against Enriquez.

---

[7] Enriquez also contends that McCluskey had knowledge of the EEOC complaint. But there is nothing in the record to indicate that McCluskey had any involvement in the termination process. Therefore, what McCluskey may have known prior to Enriquez's termination is not relevant to our analysis.

[8] There is no indication that Purcell's deposition was taken or that she provided any sworn testimony on this issue.

17

## C. Expression of a Negative Attitude

An employer's expression of a negative attitude with regard to an employee's protected activity can be a factor in determining whether there is a causal link between the protected activity and an adverse employment action. *Clark*, 544 S.W.3d at 789. Although Enriquez does not directly address this factor in her brief, she contends that the record supports a finding that there was a "pattern of antagonism" at the Center that resulted from Enriquez filing grievances.

As an example of that antagonism, Patricia Cordero testified that Enriquez had a reputation as a "complainer" at the Center. Enriquez also notes that following her February 20, 2015 complaint, McCluskey met with the four complaining employees along with David Reyes and Megliorino. After the meeting, the foursome escalated their concern to a higher management authority in which they described McCluskey at the meeting as being "mad" at them for "causing all these problems." The letter also stated that McCluskey had "threaten[ed] [their] jobs" by telling them their jobs could be "out source[d] and [doing so] would save money."

This evidence, however, is insufficient to support a finding of a negative attitude. Cordero also testified that Enriquez's reputation was based on her refusal or unwillingness to perform her assigned cleaning duties, and not the filing of grievances. Moreover, Cordero was not one of the final decision-makers, nor is there anything in the record to suggest that any of the final decision-makers viewed Enriquez in a negative light due to her protected activity. This factor also weighs against Enriquez.

## D. Failure to Follow Relevant Policies

An employer's failure to follow its relevant policies in making an adverse employment decision may also be a factor in determining whether there is a causal link between an employee's protected activity and an adverse employment decision. *See Clark*, 544 S.W.3d at 789. The

parties here disagree on whether THHSC followed its relevant policies in terminating Enriquez, and although there is some confusion in the record regarding what occurred during the termination process, THHSC substantially adhered to its relevant policies throughout the process.

### 1. *The OIG's findings were not binding on THHSC*

Enriquez contends that THHSC deviated from its policies when it terminated Enriquez for the alleged theft of the iPad when the OIG report concluded that the theft allegation was "unsubstantiated." In particular, Enriquez contends that THHSC has a "general practice" of not terminating employees accused of wrongdoing when the "allegations against [the] employee are unsubstantiated" by the OIG. In support of this contention, Enriquez cites to Patricia Cordero's deposition testimony, in which she testified that she had "heard" that THHSC will not terminate an employee accused of wrongdoing when the OIG has found the charge against the employee to be "unsubstantiated." This testimony, however, is of little probative value, as Cordero could not recall when or from whom she heard this information. Moreover, neither Enriquez nor any of the other THHSC witnesses indicated that this was in fact a THHSC policy. The THHSC policy manual pertaining to disciplinary proceedings for theft makes no mention that an OIG finding is required prior to proceeding with a termination, and instead simply states that when an employee is disciplined for committing a theft, the "likely" outcome is termination. Moreover, Ward provided unrebutted testimony at his deposition that THHSC is not required to wait for the OIG to complete its investigation before terminating an employee. Ward further testified that while THHSC could consider the OIG's finding in determining whether to discipline an employee, he explained that the OIG's conclusion is not binding on THHSC, and the agency is entitled to make an independent determination regarding whether any wrongdoing occurred, and whether and how the employee should be disciplined for such wrongdoing.

19

Enriquez also points out that the record contains evidence that THHSC terminated several employees for allegedly committing theft, and she contends that in each instance, the notices sent to those employees stated that they were being "terminated only after OIG substantiated the allegations of theft" against them. Our record contains termination notices for five employees, yet only three of the notices referenced the OIG's investigation, while two did not. Moreover, none of the notices indicated that it was THHSC's policy to only terminate an employee for wrongdoing upon a finding that the OIG had substantiated the charges against the employee.

### 2. THHSC substantially complied with its termination policies

Enriquez next points out that there is confusion in the record regarding who was the final decision-maker, correctly noting that both Martinez and Ward in their depositions denied being the final decision-maker, and instead believed the other was responsible for the final decision. Although both Martinez and Ward so testified, that does not demonstrate that THHSC substantially or significantly deviated from its policies in determining whether to terminate Enriquez.

Amy Tippie, who at the time was THHSC's Director of Executive Staff and Operations, testified that the Center's Director or the Director's delegee had final decision-making authority to terminate an employee, but that the employee's direct supervisor could make that decision in consultation with either the Director or the Director's delegee. And the record demonstrates that Purcell, who was the Center's Director at the time, had delegated this authority to Ward, and approved his request to move forward with the termination process in December of 2016. In addition, the record demonstrates that Ward had conducted his own independent investigation of the alleged theft, and in particular had viewed the surveillance footage, the OIG report, and had been made aware of the results of Enriquez's failed polygraph test. That review caused him to conclude that Enriquez had stolen the iPad. Ward then consulted with the agency's legal

20

department, as required by THHSC policy, and an unidentified employee in the legal department informed Ward that she agreed with his conclusion, and gave him "approval" to go forward with the termination process.

After receiving approval from both the legal department and from Purcell to move forward with the process, Ward had two telephonic meetings with Martinez on January 10 and January 11, 2017, in which they discussed Enriquez's case. During their meetings, Ward informed Martinez that he had reviewed the relevant evidence, and that he believed Enriquez had stolen the iPad, and that Purcell agreed with him. Ward, however, recalled that he did not express his belief that Enriquez should be terminated for the theft, and instead only discussed with Martinez the possible disciplinary actions he could take in the situation, which included termination, suspension, or a demotion. In particular, Ward recalled that he viewed the situation as a training opportunity for Martinez, as he was new to the agency, and he therefore wanted to leave the final decision up to Martinez. Martinez, on the other hand, expressed his belief that Ward had the authority to make the final decision, and recalled that Ward advised him during their first meeting that he and Purcell had already decided that Enriquez should be terminated. Moreover, Martinez acknowledged that he did not personally review the evidence against Enriquez, and instead merely "listened" to Ward's recitation of the evidence.

Any discrepancy between Ward and Martinez's recollection as to who made the final decision to terminate Enriquez does not reflect a substantial deviation from THHSC's policies. Ward could have made this decision alone, or alternatively Martinez could have made the decision in consultation with Ward. In addition, Tippie testified at her deposition that even if Martinez had the role of the final decision-maker, he was entitled to rely on Ward's recitation of the evidence

21

against Enriquez in making his decision, and that THHSC policy did not require him to independently investigate the case.

Martinez thereafter followed correct procedures in sending the disciplinary action notice to Enriquez on January 11, 2017, describing the allegation against her, and informing Enriquez of her right to file a rebuttal to the allegation before a final decision was made. And Martinez testified that he received and reviewed Enriquez's rebuttal before sending her the final termination letter on January 17, 2017. Although Martinez admittedly sent the final termination letter without consulting with Ward, the record reflects that the rebuttal was properly directed to Martinez, as he was the person who signed the disciplinary action notice, and that Martinez had the authority to independently review the rebuttal and to send the final termination letter without any additional input from Ward.[9]

In short, while there is some confusion in the record regarding the final decision-maker, there is nothing in the record to suggest that the Center substantially deviated from its standard policies in terminating Enriquez for the theft. More importantly, there is nothing in the record to indicate that Enriquez was deprived of any of her rights in the termination process. As set forth above, she was given adequate notice of the allegations, and was given the opportunity to not only file a rebuttal to the allegation, but to also appeal the termination decision to an administrative law judge. We therefore assign this factor a neutral weight in our analysis.

### E. Evidence that the Stated Reason for the Termination was False

Faced with evidence of a legitimate reason for the employment action, Enriquez needed to show that a rational juror could have found that it was false or pretextual. *See generally Texas*

---

[9] Although Enriquez finds it significant that neither Martinez nor Ward could recall who actually drafted the letter the termination letter that Martinez signed, we find nothing in the record to suggest that it was against THHSC policy to have someone other than Martinez draft the letter.

*Dep't of Transp. v. Flores*, 576 S.W.3d 782, 794 (Tex.App.--El Paso 2019, pet. denied), *citing*

*EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1198 (10th Cir. 2000) (recognizing that

when an employer gives a non-discriminatory reason for the employee's termination, the

employee may show that the stated reason was false by revealing weaknesses, implausibilities,

inconsistencies, or contradictions that a fact finder could find unworthy of credence); *see also El*

*Paso Cmty. Coll. v. Lawler*, 349 S.W.3d 81, 87 (Tex.App.--El Paso 2010, pet. denied),

(recognizing that a plaintiff may show pretext by introducing evidence proving the reasons stated

by the employer, were not its true reasons, or that its reasons were "unworthy of credence."), *citing*

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000).

In this regard, she focuses on the OIG report that found the theft allegation

"unsubstantiated," which she believes supports a finding that she did not steal the iPad, and that

the reason for the termination was therefore false. The OIG report, however, was not binding,

and the agency could independently conclude that Enriquez had committed the theft. Moreover,

as the OIG investigator explained in his deposition, he was conducting a criminal investigation,

and while he believed he did not have sufficient evidence to go forward with the charge in a

criminal court of law, he nevertheless testified that, in his professional opinion, Enriquez had in

fact committed the theft:

> Q. So even though you believed Ms. Enriquez stole an item from an individual housed at the El Paso State Center and you believe that the evidence showed that you chose not to charge her with a crime.
>
> A. Yes."
>
> [. . .]
>
> Q. And do you recall, in the video that you reviewed of the laundry room, there was footage of Ms. Enriquez walking out of the -- well, the view of the camera with something under her arm?
>
> A. Yes.

23

Q. In your opinion, was that video footage of Ms. Enriquez with the iPad?

A. Yes.

Q. Okay. So if you believed that was video evidence of Ms. Enriquez with the iPad, what piece of evidence were you missing?

A. Just a closer visual of the iPad.

[. . .]

Q. So in plain view of the video footage or of a photograph, as you said, of that footage, are you saying you couldn't really tell if that was actually the iPad or not?

A. Personal opinion, yes, I could tell that that's the iPad. Professional, I couldn't prove it.

[. . .]

Q. (BY MR. BAEZA) So you bel- -- you personally believe Ms. Enriquez stole the iPad. Can you tell me what evidence you believe -- or what evidence gives you the opinion that Ms. Enriquez was the individual that took the iPad?

A. She -- she was the only person that had that item that looked like the iPad.

Q. Okay. So the only person that you saw carrying something that looked like the iPad.

A. Yes.

Enriquez offers no evidence rebutting this testimony nor demonstrating that Sianez's position in this regard is unreasonable. And the fact Sianez did not believe he could prove the theft beyond a reasonable doubt in a criminal context, does not in and of itself defeat, or even create a fact issue. The evidence on which an employer relies to make an employment decision, such as a termination, need not rise to the beyond a reasonable doubt standard.

Moreover, despite the fact that the Center conducted a thorough investigation that memorialized all the relevant witnesses and evidence, all of which was reviewed and tested in discovery in this case, Enriquez was still unable to present any evidence that might lead a

24

reasonable jury to conclude the Center did not believe she had stolen the iPad at the time she was terminated or that such belief was not grounds for dismissal. Indeed, the record reflects that despite Enriquez's bare assertion that she did not even see the iPad much less take it, every person who viewed the video, including those who did not participate in the decision to terminate Enriquez, such as Patricia Cordero, OIG Investigator Sianez, Center Investigator Mario Gutierrez, and Security Camera Monitor Roger Rivera, were all of the opinion Enriquez was carrying the stolen iPad when she exited the janitor's closet on September 13, 2016. Moreover, her claim that she carried a puzzle book and not the iPad in the video was proven false by Sianez when he used the puzzle book to create a re-enactment video.

In sum, the objective video evidence captured in real-time coupled with the unanimous opinion testimony by every uninterested witness in this case, who all believed Enriquez stole the iPad, is strong evidence supporting THHSC's legitimate non-retaliatory justification for terminating Enriquez that cannot be overcome simply by pointing to Enriquez's self-serving and uncorroborated denial.

True enough, there was some conflicting evidence regarding Enriquez's guilt, such as the lack of fingerprints on the iPad when it was found, and the fact that other individuals may have had the opportunity to take the iPad from the closet.[10] Nevertheless, the existence of conflicting evidence, does not evidence that THHSC's stated reason was false, or that THHSC did not believe that she stole the iPad. Other than Enriquez's testimony denying she stole the iPad, there is no evidence from which a jury could infer that the Center's belief that she stole the iPad, is false. Accordingly, this factor weighs against Enriquez.

---

[10] In her brief, Enriquez points out that other individuals had access to the iPad, including Cordero, and that Cordero testified at her deposition that she took residents to the park for outings, thereby presumably giving her the opportunity to abandon the iPad there.

25

**F. Discriminatory Treatment in Comparison to Similarly Situated Employees**

And finally, the record is devoid of evidence of discriminatory treatment in comparison to a *similarly situated* employee and Enriquez does not point us to any. Enriquez's only complaint in this regard is that Cordero was not disciplined for her role in placing the iPad in the unlocked janitorial closet. However, this is not a relevant comparison, as Cordero was not accused of theft, and Cordero was therefore not a similarly situated employee. Moreover, the record contains evidence of several employees at the Center who were found to have committed theft, who were terminated from their positions. And in contrast, we find no evidence in the record that THHSC ever meted out a lesser punishment to an employee found to have stolen property from the Center. Accordingly, in the absence of any supporting evidence, we find that this factor also weighs against Enriquez.

Our review of the factors leads to the inescapable conclusion that the protected activity--the filing of the EEOC complaint in 2011 and subsequent 2015-2016 internal complaints--are not causally related to the timing of the 2017 termination. The unrebutted theft of the iPad, and THHSC's belief that Enriquez took the device (supported by video and other evidence) breaks any causal chain between the protected activity and the termination.

THHSC's Issue Two is sustained.

## VI. CONCLUSION

Having concluded that the jurisdictional evidence negates the causation element of Enriquez's case, we conclude that the trial court erred in denying THHSC's plea to the jurisdiction, and we reverse the trial court's judgment denying the plea and render a take-nothing judgment in THHSC's favor.

26

JEFF ALLEY, Justice

July 28, 2021

Before Rodriguez, C.J., Palafox, and Alley, JJ.