

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| COUNTY OF EL PASO, TEXAS, | § | No. 08-22-00060-CV |
| Appellant, | § | Appeal from the |
| v. | § | County Court at Law No. 6 |
| MICHAEL FLORES, | § | of El Paso County, Texas |
| Appellee. | § | (TC# 2019DCV2227) |

## **O P I N I O N**

After Appellee Michael Flores was terminated from his employment with Appellant County of El Paso, Texas (the County), Flores sued the County claiming it engaged in sex and disability discrimination and retaliation in connection with his termination. The County filed a plea to the jurisdiction, which the trial court denied. The County then filed this interlocutory appeal, arguing: (1) Flores filed his EEOC charge outside the jurisdictional 180-day deadline, and (2) Flores failed to allege sufficient jurisdictional facts to support violations of the Texas Commission on Human Rights Act (TCHRA) for each of his claims. For the following reasons, we affirm the trial court's denial of the plea as to Flores's disability-discrimination claim, and we reverse the denial of the plea as to Flores's sex-discrimination and retaliation claims and render judgment dismissing those claims.

# I. FACTUAL AND PROCEDURAL BACKGROUND

## A. Flores's employment history

The County hired Flores in 2004 as its Veterans Assistance (VA) Manager for the County's Community Services Department. In 2008, the County eliminated the General Assistance (GA) Manager and VA Manager positions and merged the responsibilities into one position, the GA/VA Manager position, which Flores accepted. In 2013, the County added Child Welfare Services to Flores' position, and his title became GA/VA/Child Welfare Services Program Manager.

Flores recalled that Department Director Rosemary Neill was his immediate supervisor from 2004 to 2014. After receiving a performance-evaluation score in the 60s during his first probationary evaluation, Neill subsequently gave Flores consistently high evaluation scores. Flores stated that he received several commendations for successfully submitting grant proposals that profited the County $3.1 million over a three-year period. Flores's final evaluation from Neill in 2014 reflected a high score and characterized him as "effectively performing [his] General Assistance funding responsibilities." At the time of this evaluation, Flores was one of five program managers in the Community Services Department, along with Irene Valenzuela, another female manager, and two male managers. The two male managers later left the department.[1] According to her deposition testimony, Valenzuela became the interim director of the Community Services Department in December 2014, and became the permanent director of the Community Services Department in May 2016.

Flores stated in his affidavit that he experienced a heart attack in the fall of 2015 and took approximately sixty days of medical leave under the Family and Medical Leave Act (FMLA) from

---

[1] One man was allowed to resign in lieu of termination. The other man retired after transferring to a different department.

September to November 2015. After suffering the heart attack, Flores suffered from heart palpitations and gastritis on an ongoing basis. Flores claimed in his affidavit and deposition testimony that when he returned to work in early 2016, Valenzuela, who was aware of his heart attack, informed Flores that his position would be restructured since he was being "overworked." In the spring of 2016, Valenzuela announced that she would split the GA and VA programs into standalone departments and Flores would be allowed to select one of those departments and reapply for the position. At the same time, Flores claimed that Valenzuela also informed him that she would reduce his salary to reflect the starting pay for the newly structured VA manager position. Flores stated that he immediately informed a Human Resources (HR) representative that he believed Valenzuela was discriminating against him because he had recently suffered from a heart attack. The representative told Flores that Valenzuela could not reduce his salary and force him to reapply for his position, and when Flores informed Valenzuela about this conversation, he claimed that she became upset and told Flores that he "should not have gone above her head and spoken with HR." Flores moved into the VA position in October 2016. The GA program became a standalone program on October 3, 2016.

After Valenzuela became Flores's supervisor in 2016, his performance evaluation score dropped significantly. On July 28, 2016, Flores received an evaluation from Valenzuela with an overall score of 61; in that evaluation, Valenzuela noted that the pauper-burial program experienced "setbacks when [Flores] suffered a medical emergency that sidelined him for several weeks." After the spring of 2016, Flores claimed that Valenzuela also began restricting Flores's interactions with the Commissioners Court and told him that he could not serve on the board of the El Paso Coalition of the Homeless because he was taking over the VA program and she wanted

3

to keep him in the office to check on his work.[2] Flores also stated that Valenzuela began treating him adversely compared to the female program managers during this time. According to Valenzuela's October 2016 investigation report discussed below, Flores had been given "numerous oral counseling sessions related to his management performance over the last two years," and Flores received a written warning in September 2016 for missing a program deadline and disregarding a directive from Valenzuela. Flores explained that after the male program managers left their positions, Valenzuela replaced the open program-manager positions exclusively with women during 2016. Flores alleged that Valenzuela made sexist comments to him, stating that "women are smarter than men and do things better"; Flores did not assert any particular dates or occasions during which Valenzuela made these comments. Flores also alleged that in June 2016, Valenzuela conducted interviews for the GA manager position in an irregular manner, claiming that she did not hire any of the finalists interviewed for the position but rather hired County employee Yvette Gonzalez because "she knew Ms. Gonzalez was going to lose her job."

According to Gonzalez, on October 6, 2016, she met with Flores to discuss her transition into Flores's former role and the status of twenty-five to forty "cremains" (cremated human remains) for which burial was pending through the County's pauper-burial program. Flores told Gonzalez that prior to burial, the County Roads and Bridges Department would dig burial plots. Gonzalez recalled Flores informing her that he would typically wait until he had approximately twenty-five cremains before requesting a plot to be dug because it was more cost-effective to do so but that he had recently experienced difficulty in contacting Roads and Bridges for the digging.

---

[2] A subsequent internal review of Flores's discrimination complaint showed that in February 2015, Valenzuela instituted a "chain of command procedure" for all managers that required the managers to report Commissioners Court items directly to her instead of to Commissioners Court.

4

Gonzalez went to the area where the cremains were stored and discovered over forty cremains stored in closets and in and on top of filing cabinets. Gonzalez immediately informed Valenzuela about the situation, and Valenzuela contacted HR. HR suggested that Valenzuela start an internal investigation into the pauper-burial program.

On October 7, 2016, Valenzuela began an investigation focused on Flores's purported mismanagement of the pauper-burial program. According to the investigation report, Flores had communicated with the funeral home to schedule the burials, but the funeral home was unresponsive to his requests. Flores also told Valenzuela that he had attempted to contact the Public Works representative for burials, but he had not received any communication from that person. When Valenzuela submitted her report on October 20, 2016, the audit of the burial program showed that there were sixteen "remains/bodies" and 148 cremains pending burial since 2011, and no burials had taken place since February 2015. Although Flores made initial attempts to coordinate the disposition of cremains at the Medical Examiner's Office, Valenzuela found that Flores's communication attempts were not timely and that he did not attempt to follow up on the disposition process. Valenzuela concluded that Flores was negligent in his handling of the pauper-burial program and recommended his immediate termination.

On October 14, 2016, during the investigation, Flores went on medical leave because his stomach issues had worsened and required treatment. Due to ongoing medical issues, Flores' return to work date was pushed back several times, eventually to December 1, 2016. In a series of October 18, 2016 text messages, Flores told Valenzuela that he had been admitted to the hospital for additional tests, and Valenzuela ordered Flores to "please contact HR to get on FMLA for [his] condition." On November 1, 2016, Valenzuela consulted with County HR Deputy Michelle Cochrane, who told her that Flores was allowed twelve weeks of leave and that any employment-

5

related decisions should not be made until Flores returned from FMLA leave to guard against retaliation for taking FMLA leave. Cochrane recorded in her notes that Valenzuela expressed frustration at Cochrane's advice but also expressed understanding and agreement that Flores could not be terminated at that time. On November 14, 2016, Flores went to work to submit a doctor's note and left soon thereafter because he was feeling sick.

**B.      Flores's termination**

On November 21, 2016, Valenzuela sent Flores a certified letter stating that his employment was terminated effective immediately because he had violated the County's Personal Conduct and Affairs Policy by mismanaging the pauper-burial program. The letter further stated that if Flores had "any information to provide that would make [Valenzuela] reconsider [his] termination, please provide [it] to [Valenzuela] no later than Monday, December 1, 2016."

Flores responded in writing on December 1, 2016, contending that the delays in burials were due to coordination issues with the funeral home and the County Road and Bridge Department. Flores stated he felt that Valenzuela's action was retaliatory because he was informed of his termination while on FMLA leave and that it was due to his ongoing medical condition. Cochrane, the County HR representative, recorded in her notes that she met with Flores on December 6, 2016. Flores recalled that Cochrane was confused because she believed Flores was still employed, and she told him he could not be terminated while he was on medical leave. Cochrane stated that upon review, she decided Flores's complaint did not merit an investigation or any other action. Nevertheless, Cochrane testified that during their meeting, she told Flores there was no "action process" to terminate Flores on December 1, 2016, and that he had not been terminated at that time. Cochrane asserted that Flores was not terminated until February 2017.

6

Valenzuela sent another letter to Flores on December 20, 2016, stating that he would not be required to respond to the letter until January 24, 2017, and that "[i]n the interim, you will remain an employee of El Paso County." Flores returned from FMLA leave on January 10, 2017. He renewed his complaints against Valenzuela on January 10 and 24, 2017. Cochrane related that the County formed a committee to investigate Flores's allegations on January 26, 2017. The committee concluded on February 10, 2017, that Flores's allegations were unfounded. On the same day, Valenzuela sent Flores another letter stating that his employment was terminated effective that day.

In her subsequent deposition, Valenzuela acknowledged that it was illegal to terminate Flores while he was on FMLA leave. Valenzuela alleged that the Federal Bureau of Investigation (FBI) had investigated Flores due to "irregularities having to do with grant funds" that had occasioned discussions with the El Paso County Attorney's Office. According to Valenzuela, the County Attorney's Office turned over information associated with Flores's purportedly illegal handling of grant funds to the FBI. However, the record contains no investigation report or other documentation suggesting the existence of a criminal investigation of Flores's handling of grant matters or funds.

## C.    Procedural background

On July 31, 2017, 171 days after receiving the February 10, 2017 termination letter, Flores filed a discrimination charge with the Equal Employment Opportunity Commission (EEOC). The EEOC closed its investigation on May 17, 2018. Flores then filed his original petition suing the County for discrimination based on his sex, age, and disability. Flores later amended his petition, abandoning his age-discrimination claim. The County responded by filing a plea to the jurisdiction.

7

The trial court denied the plea by written order following a multiday hearing. This interlocutory appeal ensued.

On appeal, the County raises one issue challenging the trial court's denial of its plea to the jurisdiction, arguing that the trial court erred because Flores (1) brought the suit past the jurisdictional deadline, and (2) failed to present sufficient jurisdictional facts to support a violation of the TCHRA for each of his claims.

## II. STANDARD OF REVIEW AND APPLICABLE LAW

### A. Plea to the jurisdiction

We review a trial court's denial of a plea to the jurisdiction de novo. *Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). Governmental units such as the County enjoy sovereign immunity from lawsuits, depriving the trial court of subject-matter jurisdiction, except where the Legislature waives immunity. *Flores v. Texas Dep't of Criminal Justice*, 634 S.W.3d 440, 450 (Tex. App.—El Paso 2021, no pet.) (citing *Texas Parks & Wildlife Dep't v. Sawyer Trust*, 354 S.W.3d 384, 388 (Tex. 2011)); *Mission Consol. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 636 (Tex. 2012). The Legislature has provided a limited waiver of immunity for claims properly brought against governmental units under the Labor Code. *Flores*, 634 S.W.3d at 450. However, the waiver extends only "for those suits where the plaintiff actually alleges a violation of the [Labor Code] by pleading facts that state a claim thereunder." *Texas Dep't of Criminal Justice v. Flores*, 555 S.W.3d 656, 661 (Tex. App.—El Paso 2018, no pet.) (citing *Garcia*, 372 S.W.3d at 636).

A defendant may challenge subject-matter jurisdiction through a plea to the jurisdiction. *Flores*, 634 S.W.3d at 450 (citing *Miranda*, 133 S.W.3d at 225–26). The plea can attack both the pleaded facts as well as the existence of jurisdictional facts by attaching evidence to the plea. *Id.*

8

(citing *Miranda*, 133 S.W.3d at 226–27). When, as here, the defendant challenges the existence of jurisdictional facts, the court must move beyond the pleadings and consider the evidence. *Texas Dep't of Transp. v. Lara*, 625 S.W.3d 46, 52 (Tex. 2021) (citing *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 770 (Tex. 2018)). The court can consider evidence necessary to resolve any dispute over those facts, even if the evidence implicates both the court's subject matter jurisdiction and the merits of the case. *Garcia*, 372 S.W.3d at 635.

Because this standard mirrors that of summary judgments, the plaintiff must raise at least a genuine issue of material fact to avoid dismissal if his factual allegations are challenged with supporting evidence necessary to the consideration of the plea to the jurisdiction. *Alamo Heights*, 544 S.W.3d at 771. In determining whether a material fact issue exists, we take as true all evidence favorable to the plaintiff, indulging every reasonable inference and resolving any doubts in his favor. *City of El Paso v. Heinrich*, 284 S.W.3d 366, 378 (Tex. 2009) (citing *Miranda*, 133 S.W.3d at 228). At the same time, "we cannot disregard evidence and inferences unfavorable to the plaintiff if reasonable jurors could not." *Alamo Heights*, 544 S.W.3d. at 771.

## B.     TCHRA

The TCHRA prohibits an employer from discriminating against employees on the basis of "race, color, disability, religion, sex, national origin, or age[.]" TEX. LAB. CODE ANN. § 21.051. Similarly, Chapter 21 protects employees from retaliation by their employer for reporting discrimination, opposing discrimination, and participating in an investigation, proceeding, or hearing regarding discrimination. *Id*. § 21.051. The legislature intended to model the TCHRA after federal employment discrimination law. Accordingly, we may look to federal law to interpret its provisions. *AutoZone, Inc. v. Reyes*, 272 S.W.3d 588, 592 (Tex. 2008) (per curiam).

9

A plaintiff may rely on either direct or circumstantial evidence to establish a prima facie case of unlawful discrimination; however, "direct evidence of discriminatory intent is typically 'hard to come by[.]'" *Texas Tech Univ. Health Scis. Ctr.-El Paso v. Flores*, 612 S.W.3d 299, 305 (Tex. 2020) (quoting *Garcia*, 372 S.W.3d at 634). Where, as here, a plaintiff relies on circumstantial evidence to establish his claims, we follow the *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under the *McDonnell Douglas* framework, (1) the plaintiff must first create a presumption of illegal discrimination (or retaliation) by establishing a prima facie case; (2) the defendant must then rebut that presumption by producing a legitimate, nondiscriminatory reason for the adverse employment action; and (3) the plaintiff must then overcome the rebuttal evidence by raising a genuine issue of material fact indicating that the defendant's stated reason is pretextual (or as to the retaliation claim, that but-for the protected activity, the termination would not have occurred when it did). *Id*.; *see also Apache Corp. v. Davis*, 627 S.W.3d 324, 325–26 (Tex. 2021), and *Alamo Heights*, 544 S.W.3d at 771. Generally speaking, self-serving, speculative, and conclusory statements of fact or law are insufficient to raise a material issue of fact; thus, we look to additional evidence in the record to determine whether a fact issue exists. *See Los Cucos Mexican Cafe, Inc. v. Sanchez*, No. 13-05-578-CV, 2007 WL 1288820, at *2 (Tex.App.—Corpus Christi–Edinburg May 3, 2007, no pet.) (mem. op); *Vice v. Kasprzak*, 318 S.W.3d 1, 11 n.5 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

In this case, the County raises one issue challenging the trial court's denial of its plea to the jurisdiction based on Flores missing a jurisdictional deadline and Flores failing to present sufficient jurisdictional facts to support TCHRA violations. We address each basis in turn.

### III. TIMELY FILING OF EEOC CHARGE

To bring a lawsuit for this type of alleged unlawful employment practice, a plaintiff must first have timely filed an administrative charge with the EEOC. *Southwest Convenience Stores, LLC v. Mora*, 560 S.W.3d 392, 400 (Tex. App.—El Paso 2018, no pet.). A plaintiff filing a claim under the TCHRA must file a sworn, written complaint with the EEOC no later than the 180th day after the alleged unlawful employment practice occurred. TEX. LAB. CODE ANN. §§ 21.201, .202; *see Prairie View A & M Univ. v. Chatha*, 381 S.W.3d 500, 513 (Tex. 2012). Failure to comply with statutory prerequisites pertaining to filing a complaint—including failure to file a complaint within the 180-day deadline—deprives a court of subject-matter jurisdiction, barring Texas courts from adjudicating that complaint. *See* TEX. GOV'T CODE ANN. § 311.034; *Chatha*, 381 S.W.3d at 515–16; *Southwest Convenience Stores, LLC*, 560 S.W.3d at 400.

Although the term "occurred" as used in § 21.202(a) is not statutorily defined, the Texas Supreme Court has defined that term to mean "when a discriminatory employment decision is made—not when the effects of that decision become manifest in later events." *Chatha*, 381 S.W.3d at 503; *see also Specialty Retailers, Inc. v. DeMoranville*, 933 S.W.2d 490, 493 (Tex. 1996) (per curiam) (the 180-day limitations period in the TCHRA begins "when the employee is informed of the allegedly discriminatory employment decision, not when that decision comes to fruition."); *City of El Paso v. Granados*, 334 S.W.3d 407, 411 (Tex. App.—El Paso 2011, no pet.) (holding that the 180-day period began when employee was informed of decision to terminate, and not when employee exhausted Civil Service Commission appeals process).

Here, the County argues that the 180-day deadline began to run on November 21, 2016, the day Valenzuela sent Flores the first termination letter, and thus Flores's EEOC complaint filed on July 31, 2017—252 days later—was untimely. Although Valenzuela sent the November 21,

2016 letter purportedly terminating Flores' employment, subsequent events indicate that Flores was not terminated at that time. County HR Representative Cochrane told Flores no final decision regarding his employment had been made and that he was not terminated at that time. Instead, Valenzuela's February 10, 2017 letter informed Flores of the County's decision to terminate his employment "effective end of business Friday, February 10, 2017." As Flores points out, logic dictates that Flores could not be fired on November 21, 2016, and fired again on February 10, 2017. While Valenzuela formed an intent to terminate Flores in November, HR made clear he was not terminated in November. Even if there were a conflict between these purported termination dates, it would create a fact question that precludes the grant of a plea to the jurisdiction. *See Dixon v. Bank of New York Mellon*, 507 S.W.3d 783, 787 (Tex. App.—El Paso 2015, no pet.) ("If the evidence creates a fact question regarding the jurisdictional issue, then the trial court cannot grant the plea to the jurisdiction, and the fact question will be resolved by the fact finder.") (citing *Miranda*, 133 S.W.3d at 227–28).

Because the County has not shown, as a matter of law, that Flores's termination date was November 21, 2016, and because the record indicates Flores received notice of his termination on February 10, 2017, Flores satisfied the jurisdictional requirement by filing his EEOC charge on July 31, 2017—171 days later after February 10, 2017.

Accordingly, the portion of the County's sole issue on appeal is overruled.

## IV. DISCRIMINATION CLAIMS

Having determined that Flores satisfied the jurisdictional filing deadline, we next determine whether the trial court erred by denying the County's plea to the jurisdiction as to Flores's disability- and sex-discrimination claims.

12

**A.    Did Flores establish sufficient jurisdictional facts to overcome the County's immunity on his disability-discrimination claim?**

*1.    Prima facie case*

A plaintiff must first establish a prima facie case of disability discrimination to show that the governmental employer waived its immunity and the trial court has jurisdiction. *El Paso Cnty. v. Vasquez*, 508 S.W.3d 626, 638 (Tex. App.—El Paso 2016, pet. denied) (citing *San Antonio Water Sys. v. Nicholas*, 461 S.W.3d 131, 136 (Tex. 2015)). To do this, a plaintiff must show: (1) he has a disability; (2) he was qualified for the job; and (3) he suffered an adverse employment action because of his disability. *Texas Dep't of State Health Servs. v. Resendiz*, 642 S.W.3d 163, 174 (Tex. App.—El Paso 2021, no pet.) (citing *Vasquez*, 508 S.W.3d at 639). The prima facie elements at issue here are the first and third.

a.    <u>Did Flores have a disability?</u>

The County argues Flores has not shown that he had or was perceived to have a disability because he only alleged he was terminated because he was on FMLA leave. The County argues on appeal that "the only medical evidence [of his disability] was a doctor's note releasing [him] to regular full-duty work, without limitations or restrictions."

"A disability is defined as 'a mental or physical impairment that substantially limits at least one major life activity of that individual, a record of such an impairment, or being regarded as having such an impairment.'" *Vasquez*, 508 S.W.3d at 639 (quoting TEX. LAB. CODE ANN. § 21.002(6)). Courts have interpreted a "major life activity" as "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Id*. (quoting *Union Carbide Corp. v. Mayfield*, 66 S.W.3d 354, 360 (Tex. App.—Corpus Christi 2001, pet. denied). And the Texas Supreme Court recognizes that a disability under the TCHRA "must be

13

one which is generally perceived as severely limiting [the plaintiff] in performing work-related functions in general." *Id.* (quoting *Chevron Corp. v. Redmon*, 745 S.W.2d 314, 318 (Tex. 1987)).

The record suggests that prior to Flores's termination, his heart palpitations and gastritis occasioned the need for diagnostic procedures, treatment, and hospitalization. Valenzuela was aware of this as Flores was intermittently unable to work for these reasons. October 18, 2016 text messages between Valenzuela and Flores showed she was aware of Flores's ongoing treatment for his medical conditions, including Flores's admission to the hospital, multiple diagnostic tests, and the need for possible surgery. In these text messages, Valenzuela told Flores to "please contact HR to get on FMLA for [his] condition." Moreover, Valenzuela's performance review of Flores stated that the pauper-burial program experienced "setbacks when [Flores] suffered a medical emergency that sidelined him for several weeks."

As such, there is evidence in the record that Flores had a disability under the TCHRA, and we find that Flores has met his initial burden to show a prima facie case for disability discrimination. *Compare with Vasquez*, 508 S.W.3d at 640 (finding that an employee did not establish a prima facie case for disability discrimination after she suffered from a heart attack because she had recovered from the heart attack and doctors had released her to resume work at the time of the adverse employment action).

b.    Was Flores terminated because of his disability?

Flores also had to show evidence that he was terminated because of his disability. *Lara*, 625 S.W.3d at 61; *see also Trevizo*, 2023 WL 1069706, at *7. The record contains evidence suggesting that there was an ongoing frustration on Valenzuela's part regarding Flores being pulled away from his work duties due to his medical problems. Flores claimed in his affidavit that after he suffered a heart attack in fall 2015, Valenzuela told him she was going to restructure his position

14

by splitting the GA and VA programs to "take pressure off [him]" because he had suffered a heart attack but then attempted to lower his pay. Although his own statement is insufficient to raise a fact issue suggesting the connection between his disability and adverse employment actions by Valenzuela, the record contains other evidence indicating her discriminatory animus. *See Texas Dep't of Motor Vehicles v. Bustillos*, 630 S.W.3d 316, 333 (Tex. App.—El Paso 2021, no pet.) (an employee's expression of a subjective belief of discrimination, without more, is insufficient to support the causal connection in an employment-discrimination case). In particular, when Valenzuela gave Flores a poor performance review in July 2016, she factored in the "setbacks" the pauper-burial program experienced "when [Flores] suffered a medical emergency that sidelined him for several weeks." And the text messages from October 18, 2016—one month before Flores's purported termination on November 21, 2016—shows communication between Flores and Valenzuela about his continued need for hospitalization and treatment for the complications arising from his heart attack. Cochrane, an HR representative, also noted in November 2016 that Valenzuela expressed frustration about the inability to move to terminate Flores while on medical leave after Cochrane advised her as such. Accordingly, Flores has shown a genuine issue of material fact that his termination was because of his disability.

### 2. Legitimate, nondiscriminatory business reason

Because Flores has met his initial burden to show a prima facie case, we next determine whether the County has produced evidence of a legitimate, nondiscriminatory business reason for Flores's termination. *See Alamo Heights*, 544 S.W.3d at 782; *Moreno v. Texas Dep't of Transp.*, 440 S.W.3d 889, 895 (Tex. App.—El Paso 2013, pet. denied). "[A]n employer's articulated reasons for the adverse termination decision must be sufficiently specific to give the employee the opportunity to present evidence establishing that the reasons were pretextual." *Resendiz*, 642

S.W.3d at 175–76. The employer's burden to provide a legitimate, nondiscriminatory reason for termination is one of production, not persuasion. *Bowen v. El Paso Electric Co.*, 49 S.W.3d 902, 909 (Tex. App.—El Paso 2001, pet. denied) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)); *see also Alamo Heights*, 544 S.W.3d at 782 ("[T]he burden of persuasion remains at all times with the employee.").

The County produced some evidence that Flores was terminated because of his mismanagement of the pauper-burial program, pointing to the "hoarding" of human remains and Flores's failure to arrange for the timely burial of the remains. The County names insubordination as a reason for his termination based on his handling of the pauper-burial program. The County's evidence came in the form of Valenzuela's report of her investigation into the pauper-burial program as well as Valenzuela's termination letters alleging Flores's mismanagement of the pauper-burial program and insubordination as the reasons for his termination. Valenzuela also alleged that the Federal Bureau of Investigation (FBI) had investigated Flores due to "irregularities having to do with grant funds" that had occasioned discussions with the El Paso County Attorney's Office, although the record contains no documentation of any such investigation.

We find that the County has satisfied its burden to produce a legitimate, nondiscriminatory reason for Flores's termination by raising the pauper-burial program mismanagement. *See Moreno*, 440 S.W.3d at 895 (employer's production of some evidence that the employee was fired for acting unprofessionally toward other employees and verbally abusing them were legitimate, nondiscriminatory reasons for firing the employee).

### 3. Pretext

Because the County met its burden of production, Flores must produce evidence to show that the County's stated reasons for his termination was a pretext for discrimination. *See Quantum*

*Chem. Corp. v. Toennies*, 47 S.W.3d 473, 477 (Tex. 2001). "A plaintiff can avoid summary judgment if the evidence taken as a whole creates a fact issue as to whether the employer's stated reason was not what actually motivated the employer *and* creates a reasonable inference that discriminatory intent was a determinative factor in the adverse employment decision." *Madden v. El Paso Indep. Sch. Dist.*, 473 S.W.3d 355, 360 (Tex. App.—El Paso 2015, no pet.) (quoting *Bedgood v. Texas Educ. Agency*, No. 03-14-00030-CV, 2015 WL 739635, at *2 (Tex. App.—Austin Feb. 19, 2015, pet. denied) (mem. op.) (emphasis in original)).

### a.      Flores argues the County's stated reasons were false

Flores argues that the reasons articulated for his termination were false, pointing to Valenzuela's frustration with his illness-related absences and the County's reliance on the shock value caused by the gruesome nature of the pauper-burial program to mask Valenzuela's discriminatory intent. He contends the County's allegations that he mismanaged the pauper-burial program by hoarding human remains are not supported by the record. In particular, he points to the common practice of accumulating twenty-five boxes of cremains prior to asking the Roads and Bridges Department for digging services rather than going through the process and expense of requesting to dig a new burial plot for each box or few small boxes of cremains. Flores also asserts that he experienced difficulties coordinating with the Roads and Bridges Department and a funeral home as well as issues regarding purchasing burial equipment and difficulties in contacting the decedents' next of kin to claim bodies, all of which further contributed to delays in burials. Flores also argues that Valenzuela's reasons for firing him were pretextual because the County does not point to any written County policy or local, state, or federal law or regulation he violated through his handling of the pauper-burial program.

17

With regard to Valenzuela's allegations that the FBI investigated him over grant-fund irregularities and that he illegally handled grant funds, Flores points out that the record contains no investigation report or other documentation supporting those allegations. As to grant matters, Flores stated that while at the County, he had received several commendations for successfully submitting grant proposals that profited the County $3.1 million over a three-year period. Flores's 2014 evaluation characterized him as "effectively performing [his] General Assistance funding responsibilities."

### b. Flores creates a reasonable inference that discriminatory intent was a determinative factor in his termination

Flores points to Valenzuela's constant issues with his medical conditions, from the time he suffered a heart attack in the fall of 2015 to his ongoing conditions: heart palpitations and gastritis thereafter. Flores claimed Valenzuela told him in spring 2016 that she was going to restructure his position by splitting the GA and VA programs to "take pressure off [him]" because he had suffered the heart attack. Valenzuela allowed Flores to pick between the GA and VA manager positions, but then told Flores that he would have to reapply for the new position and that his salary would be reduced. When Flores pointed out that she could not reduce his salary and force him to reapply for the position, Valenzuela responded, "We will see about that." Flores contacted the County's HR Department and lodged a disability-discrimination complaint, and a representative informed him that he would not need to reapply for the position and his salary would not be decreased. Valenzuela was reportedly upset that Flores had "gone above her head and spoken with HR." Valenzuela also told Flores that she "wanted to keep [him] in the office as much as possible so she could check up on [him]."

In July 2016, Valenzuela gave Flores a performance evaluation with a score of 61, a 32-point drop from the previous evaluation from his former supervisor, Neill. While Valenzuela had the discretion to evaluate him, she specifically referred to pauper-burial program "setbacks when [Flores] suffered a medical emergency that sidelined him for several weeks" in the evaluation document.

On October 7, 2016, Flores met with Valenzuela and the GA manager, Yvette Gonzalez, but they did not discuss the pauper-burial program with him. During this time, Valenzuela investigated the program and concluded that Flores was "negligent in his handling of the burial process" and was "deceitful" in his responses to investigation questions. On October 14, 2016, Flores told Valenzuela that he would be taking FMLA leave due to stomach issues that were severe enough to require hospitalization. On November 1, 2016, Flores sent Valenzuela an email stating that he would be out of the office until November 10, 2016. After providing appropriate documentation, Flores extended his medical leave until November 10, 2016, but subsequently texted Valenzuela that he was extending his return-to-work date to December 1, 2016. On November 1, 2016, Valenzuela spoke to HR representative Cochrane and "expressed frustration and a need to move forward due to the importance of the services that Mr. Flores oversees"; Cochrane told Valenzuela to plan for someone else to "cover his duties should he be out for the allowable 12 weeks on FMLA[.]" Cochrane advised Valenzuela that no adverse action should be taken while Flores was on medical leave. In her deposition testimony, Valenzuela acknowledged that it was illegal to fire someone while he was on FMLA leave. Nonetheless, Valenzuela sent the first termination letter on November 16, 2016, while Flores was on leave, stating that his mishandling of the pauper-burial program violated the County's Code of Conduct provision that

19

"as public servants, County employees should strive to improve the public's confidence in the integrity of the County through their own conduct."

Although the County asserts that Flores was terminated for insubordination and mismanaging the pauper-burial program, it does not point to any County policy regarding deadlines or timing of disposing of human remains under the care of the pauper-burial program. Nor does the County cite any local, state, or federal law on that issue, and Valenzuela acknowledged in her deposition testimony that she was not aware of any written policy of how many burials should be performed in a single month. Regarding burial, Flores told Gonzalez that it was more cost-efficient to have the Roads and Bridges Department dig a burial plot for multiple boxes of cremains at the same time instead of burying them individually. Flores also told Gonzalez that he had experienced difficulties contacting the Road and Bridges Department to inform them of the need to dig plots for the accumulated remains.

Based on the above evidence, there is a question of fact concerning whether the reasons for Flores's termination—his mismanagement of the pauper-burial program and insubordination—were false. Moreover, the evidence raises a reasonable inference that discriminatory intent was a determinative factor in his termination: Valenzuela was frustrated by Flores's disability, particularly the delays caused to his work by his intermittent illness-related absences, and she attempted to restrict his work responsibilities and eventually terminated him because of his illness-related delays in his work. We conclude that the trial court did not err by denying the County's plea to the jurisdiction on this basis.

Accordingly, the County's sole issue as it pertains to Flores's disability-discrimination claim is overruled.

20

**B. Did Flores establish sufficient jurisdictional facts to overcome the County's immunity on his sex-discrimination claim?**

*1. Flores sufficiently alleged sex discrimination in his EEOC charge*

As a preliminary matter, the County raises an argument solely associated with Flores' sex-discrimination claim: that he failed to exhaust his administrative remedies on this claim because he did not properly allege sex discrimination in his EEOC complaint. We disagree.

"[T]he exhaustion of administrative remedies is a mandatory prerequisite to filing an action under TCHRA, and the failure to exhaust TCHRA's administrative remedies deprives the court of subject-matter jurisdiction." *Williams-Pyro, Inc. v. Barbour*, 408 S.W.3d 467, 476 (Tex. App.—El Paso 2013, pet. denied). Although courts construe complaints filed under the TCHRA liberally and may look beyond the four corners of the charge, the charge "must contain a sufficient factual basis to put the employer on notice of the existence and nature of the charges." *Id.* "The crucial element of a charge of discrimination is the factual statement contained in the administrative complaint." *Id.* The scope of a suit under TCHRA is limited to the scope of the investigation that 'can reasonably be expected to grow out of the charge of discrimination.'" *Id.* (quoting *Pacheco v. Mineta*, 448 F.3d 783, 789 (5th Cir. 2006)). Thus, a plaintiff's claims are limited to claims stated in his administrative complaint, along with factually related claims that could reasonably be expected to be encompassed by the employer's investigation of the claims stated in the charge. *Id.*

Here, Flores amended his petition by adding allegations that Valenzuela made discriminatory comments toward Flores because he was male and that she accused him of being dumb because he was male. On Flores's EEOC complaint, he checked the box labeled "sex" as one of the bases for his discrimination claims. In the factual background section of the charge, Flores stated, "I am aware that I was replaced by a female, Yvette Gonzalez," and he stated that

he believed that he had been discriminated against because he was male. The charge contains no further information regarding sex discrimination against Flores. Given that we must construe charges liberally and the charge included allegations suggesting sex discrimination, we conclude that Flores included sufficient information in the EEOC charge to give the County notice that he was alleging sex discrimination thus he effectively exhausted his administrative remedies. *See id.* at 476 ("If, by looking to either the factual allegations or the checked boxes, a specific type of discrimination claim could reasonably be expected to grow out of the allegations in an EEOC charge, then the plaintiff has exhausted her administrative remedies.").

### 2. *Prima facie case*

To establish a prima facie case of sex discrimination, Flores was required to show: (1) he is male; (2) he was qualified for his position; (3) his employment was terminated; and (4) he was treated less favorably than similarly situated female employees. *Ysleta Indep. Sch. Dist. v. Monarrez*, 177 S.W.3d 915, 917 (Tex. 2005) (per curiam). The County solely challenges the last element, arguing that Flores has not shown a fact issue with regard to being treated less favorably than similarly situated women. We agree.

"Employees are similarly situated if their circumstances are comparable in all material respects, including similar standards, supervisors, and conduct," such that their situations and conduct are "nearly identical." *Exxon Mobil Corp. v. Rincones*, 520 S.W.3d 572, 584 (Tex. 2017) (quoting *Ysleta Indep. Sch. Dist. v. Monarrez*, 177 S.W.3d 915, 917 (Tex. 2005) (per curiam), and *AutoZone, Inc.*, 272 S.W.3d at 594). Thus, "[e]mployees with different responsibilities, supervisors, capabilities, work rule violations, or disciplinary records are not considered to be 'nearly identical.'" *Exxon Mobil Corp.*, 520 S.W.3d at 584 (quoting *AutoZone, Inc.*, 272 S.W.3d at 594). "Employees who hold different jobs are not similarly situated." *Id.*; *see also Flores*, 612

22

S.W.3d at 312. Here, Flores asserts that Yvette Gonzalez, a female, is a similarly situated employee. Flores posits that (1) both he and Gonzalez were program managers at the same administrative level; (2) they both shared the same supervisor, Valenzuela; and (3) Flores and Gonzalez were subjected to different punishments for violating the same County policy.

Nevertheless, the record does not indicate that Flores and Gonzalez shared similar responsibilities or had the same job descriptions. Although Flores and Gonzales were managers at the same administrative level within the Community Services Department, their job responsibilities were entirely different. As noted above, the GA and VA manager positions were distinct positions with different job responsibilities, and in fact the two distinct positions had been created from what was once a single GA manager position. After this split, Flores became the VA manager who managed, among other things, the pauper-burial program. In contrast, Gonzalez became the GA manager with the job title "Clinical Services Manager," which made her responsible for managing the Behavioral Health Support Services (BHSS) Division, particularly managing the reentry of individuals who were being released from the County jail back into the public. Gonzalez's performance review also suggests that she was responsible for "staying abreast of the clinician's cases, reporting requirements and case scheduling," and maintaining knowledge of the social work field. Moreover, the County's job posting for the GA-manager position states that the manager is responsible for unique County assistance programs that aid County residents, including "child welfare services that meets [sic] the needs of children receiving protective services."

Although we recognize that Flores's burden to show a prima facie case is not onerous, the record shows that Flores and Gonzalez were not similarly situated with regard to their job responsibilities. Accordingly, Flores failed to satisfy his burden to show a prima facie case as to

his sex-discrimination claim. *See Flores*, 612 S.W.3d at 311–12 (employee failed to show prima facie case on sex-discrimination claim where the employer restructured the office and the employee and comparator held different jobs); *Cnty. of El Paso v. Aguilar*, 600 S.W.3d 62, 84–86 (Tex. App.—El Paso 2020, no pet.) (employee failed to show prima facie case on sex-discrimination claim where she and purported comparators held different jobs with different responsibilities).

### 3. *Hostile work environment*

Flores also asserts sex discrimination under a hostile work environment theory. "To make a prima facie showing of a hostile environment claim, a plaintiff must show in part that the workplace was permeated with discriminatory intimidation, ridicule, and insult sufficiently severe or pervasive to alter the conditions of the victim's employment and create a hostile or abusive working environment." *Esparza v. Univ. of Texas at El Paso*, 471 S.W.3d 903, 912 (Tex. App.— El Paso 2015, no pet.) (explaining that both subjective and objective hostile or abusive environment must be shown and that abusiveness requires extreme conduct).

Flores asserts this theory based on the following: (1) Valenzuela replaced male managers with female managers; (2) Valenzuela told Flores that she believed women were smarter than men and did things better; (3) she engaged in a "concerted harassment campaign" to remove Flores once he was the only remaining male manager in the Community Services Department; (4) Valenzuela restricted Flores's access to Commissioners Court and outside activities; and (5) Flores suffered an emotional breakdown and aggravation of his physical ailments when Valenzuela threatened to fire him.

We do not find that Flores has raised a material fact as to this claim. Although he argues that Valenzuela replaced male managers with female managers, there record is bare of any context

in terms of the female hires into the open positions that the male managers vacated. Valenzuela's statements amount to stray remarks that do not rise to level of being so severe or pervasive as to create an objectively hostile or abusive environment. Finally, Flores has not raised a fact issue as to hostile environment on the basis of sex by arguing that Valenzuela engaged in a "concerted harassment campaign" to remove him, that she restricted his access to Commissioners Court, or that he had an emotional breakdown and aggravation of his physical ailments. *See Esparza*, 471 S.W.3d at 913–14 (holding that allegations of supervisors intimidating the employee, removing her from important projects, delaying approval of vacation time, and changing her work schedule not sufficiently severe or pervasive enough to create objectively hostile or abusive work environment). For these reasons, Flores's prima facie case of sex discrimination on a hostile work environment theory fails.

Accordingly, the County's sole issue as it pertains to Flores's sex-discrimination claim is sustained.

## V. RETALIATION CLAIM

Finally, we consider whether Flores alleged sufficient jurisdictional facts to support his retaliation claim.

### A. Retaliation claims generally

The TCHRA also prohibits retaliation against an employee from engaging in a protected activity, such as filing a complaint of discrimination. *Alamo Heights*, 544 S.W.3d at 786 (citing TEX. LAB. CODE ANN. § 21.055). A retaliation claim may be actionable even if a discrimination claim is not. *Id.* at 781. "Unlike a discrimination claim, a retaliation claim focuses on the employer's response to an employee's protected activity, . . . rather than on the validity of the

underlying discrimination complaint." *Resendiz*, 642 S.W.3d at 180 (citing *Alamo Heights*, 544 S.W.3d at 763–64).

Retaliation claims use the same *McDonnell Douglas* burden-shifting analysis set forth above. *See Alamo Heights*, 544 S.W.3d at 781–82. An employee's claim can survive only if he has established a prima facie case of retaliation. *See Lara*, 625 S.W.3d at 58. If an employee establishes a prima facie case of retaliation, a rebuttable presumption of discrimination arises that can alone sustain a discrimination claim. *Alamo Heights*, 544 S.W.3d at 782. "But the employer can defeat this presumption merely by producing evidence of a legitimate, nondiscriminatory reason for the disputed employment action." *Id.* Once the employer presents a legitimate, nondiscriminatory reason for the adverse employment action, the burden shifts back to the plaintiff to raise a fact issue showing that the employer's explanation was a pretext and that he would have not been terminated but for engaging in the protected activity. *See id.* at 790. The burden of persuasion remains at all times with the employee. *Id.* at 782.

## B.     Prima facie case

To establish a prima facie case of retaliation, an employee must show: (1) he engaged in an activity protected by the TCHRA; (2) he experienced a material adverse employment action; and (3) a causal link exists between the protected activity and the adverse action. *Id.* at 782. The first two elements are not at issue. As to the third, a plaintiff must only show a "minimal" causal link between the protected activity and the adverse action. *Id.* at 789. The causation standard is not onerous and can be established "merely by proving close timing between the protected activity and the adverse action." *Id.*

Flores argues that a causal link exists between his complaint and his termination because of the temporal proximity between complaining to HR in January 2017 and his termination on

February 10, 2017. The County argues that there is no causal link because he was terminated on November 21, 2016—before he complained. While we disagree that Flores was terminated in November, Valenzuela's November letter reflected her intent to terminate Flores. And the Texas Supreme Court has held that "'[c]arrying out a previously planned employment decision is no evidence of causation,' even if the employment decision was 'contemplated[] though not yet definitively determined.'" *Apache Corp.*, 627 S.W.3d at 337 (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001), and *Alamo Heights*, 544 S.W.3d at 790).

In *Alamo Heights*, the undisputed evidence showed that the employer made the decision to implement the adverse action before it knew of the employee's charge of discrimination. *Alamo Heights*, 544 S.W.3d at 789–90. Because "[c]arrying out a previously planned employment decision is no evidence of causation," the employee's retaliation claim based on the adverse action failed at the prima facie stage. *Id.* at 790. Similarly, Flores's retaliation claim, to the extent it is based on complaining of discrimination in January 2017, fails. Although according to Flores, his first complaint of disability discrimination was to Valeria Fernandez, a County HR representative, in February or March 2016,[3] his sole contention on appeal regards retaliation for complaining of disability discrimination in January 2017.

Accordingly, the County's issue as it pertains to Flores's retaliation claim is sustained.

## VI.  CONCLUSION

We affirm the trial court's order denying the County's plea to the jurisdiction as to Flores's disability discrimination claim and we remand that claim for further proceedings consistent with

---

[3] Fernandez stated in a sworn affidavit that Flores did not make any discrimination complaints to her in 2016.

this opinion. We reverse the trial court's order denying the County's plea to the jurisdiction as to Flores's sex-discrimination and retaliation claims and render judgment dismissing those claims.

LISA J. SOTO, Justice

March 9, 2023

Before Rodriguez, C.J., Soto, J., Marion, C.J. (Ret.)
Marion, C.J. (Ret.) (sitting by assignment)